**BROWNSVILLE MEDICAL CENTER and Valley Community Hospital, Appellants,**

v.

**Fermin GRACIA, Sr., and Guadalupe C. De Gracia, Parents of Fermin Gracia, Jr., Deceased, Appellees.**

**No. 13–84–369–CV.**

Court of Appeals of Texas, Corpus Christi.

June 28, 1985.

Rehearing Denied Aug. 30, 1985.

David M. Davis, Davis & Davis, P.C., Austin, for appellant, Valley Community Hospital.

William L. Hubbard, Adams, Graham, Jenkins, Graham & Hamby, Harlingen, for appellant Brownsville Medical Center.

Clem V. Lyons, David M. Adkisson, Stephen Dittlinger, Southers & Lyons, Inc., San Antonio, for appellees.

Before UTTER, KENNEDY and BISSETT [1], JJ.

## OPINION

UTTER, Justice.

This is a medical negligence case. Appellees sued numerous health care providers, including appellants, seeking damages for the alleged wrongful death of their child, and received judgment against appellants. We affirm the judgment of the trial court.

The record reveals the following: On July 16, 1979, appellees' nine year old child was kicked in the stomach by another youth and soon thereafter began complaining about stomach pains. The next day, the child continued to complain about stomach pain, he "had a fever," and he vomited "when he tried to eat" and when "anything just touched his stomach." On July 18, 1979, the child "was the same, complaining about the same pain, and had the same symptoms," so appellees took their child to a hospital in Matamoros, Mexico, where he was admitted and remained for approximately four days.

On July 22, 1979, appellees discharged their son from the Matamoros hospital against medical advice because "there was never any change"—"he didn't get any better." Following the discharge, appellees took their child to the emergency room at Brownsville Medical Center.

At the emergency room at Brownsville Medical Center, the child was seen "around 7:00 or 8:00" p.m. by Dr. Elias Lorenzana, who physically examined the child and ordered certain lab tests and x-rays. During the examination, Dr. Lorenzana noted that the child was experiencing some mild tenderness in his right lumbar area, he appeared jaundiced, and his bowels were hyperactive. Because Dr. Lorenzana only spoke English and appellees only spoke Spanish, all communications between them were interpreted by a hospital nurse. According to appellees, Dr. Lorenzana told

1. Associate Justice (Ret.), Court of Appeals, Thirteenth Supreme Judicial District, sitting by designation. See TEX.REV.CIV.STAT.ANN. art. 1812 (Vernon Supp.1985).

them that "it was nothing serious, it was a simple case of anemia." Mrs. Gracia testified (1) that Dr. Lorenzana told her that they could take the child home, should place him on a bland diet and should take him on the next morning to Dr. Posnett, a pediatrician, (2) that Dr. Lorenzana never recommended that the child should be hospitalized and (3) that Dr. Lorenzana did not tell her that, if the child became worse during the night, she should return the child to the emergency room. However, Dr. Lorenzana testified and medical records indicated that the primary diagnosis was hepatitis caused by some type of infection. Dr. Lorenzana further testified that he recommended (1) that the child could go home and get some bed rest, (2) that, if the child were to feel worse during the night, the child should be returned to the emergency room and (3) that the child should "by all means" go see the pediatrician the next morning. Dr. Lorenzana stated that "they were given the option" to have their child hospitalized but that he felt that the child was not critically ill and did not require hospitalization at that time. Before he released the child, Dr. Lorenzana personally reviewed the x-rays taken, but he did not have the benefit of the radiologist's report interpreting the x-rays until the following day. At the time he made his diagnosis of hepatitis, Dr. Lorenzana did not consider pancreatitis as a possible diagnosis and, after having reviewed the radiologist's report the following day, he then considered appendicitis as a possible diagnosis. The radiologist's report indicated that there were "some air filled slightly dilated small bowel segments in the right quadrant which may represent a localized ileus possibly due to appendicitis though clinical correlation is necessary."

After appellees and their child returned home that evening, the child still complained about his stomach pain, his fever had diminished, but he "seemed to be doing a little better." The child went to sleep that night; but, when he awoke "early" the following morning, he was feeling worse—he again had stomach pain and a fever.

That morning, July 23, 1979, Mrs. Gracia took her child to Dr. Carlos Monarrez, a pediatrician, who examined the child and ordered certain lab tests and x-rays. After examining the child, Dr. Monarrez concluded (1) that the child had an "acute abdomen" with differential diagnoses including pancreatitis, hepatic abcess, appendicitis and typhoid fever and (2) that the child was "a very strong candidate for surgery." From his office, Dr. Monarrez called a general surgeon, Dr. Raul Rodriguez, at Valley Community Hospital for surgical consultation. Dr. Rodriguez agreed to immediately see the child at Valley Community Hospital. According to Mrs. Gracia, Dr. Monarrez had told her that her child's condition "was quite delicate and he needed surgery"; and, when he called "over there," Dr. Monarrez "told them to prepare to take him into surgery right away." The child was immediately taken by ambulance to Valley Community Hospital to be examined by Dr. Rodriguez.

Upon arrival at Valley Community Hospital at approximately 10:00 a.m. that same morning, July 23, 1979, the child was admitted through a "direct admission" process whereby he was taken directly to be examined by Dr. Rodriguez and then later to a hospital room. In the meantime, Mrs. Gracia provided admission-related information to a receptionist/clerk and a social worker at the hospital. At this time, Mrs. Gracia also signed a "Conditions of Admission" form. Minerva G. Coronado, the social worker, testified that Mrs. Gracia had been referred to her office for "financial evaluation" and that persons would be referred to her office "if they were not able to meet their hospital deposit or were having concerns over the hospital bill" and would be "screened for a possible referral to a financial resource." During the interview between the social worker and Mrs. Gracia, it was determined that appellees did not have medical insurance and could not qualify for financial assistance. The social worker also stated that "the doctors and nurses" were advised regarding the financial evaluation but that she did not make any recommendations regarding

whether appellees' child should have been admitted.

While Mrs. Gracia was being interviewed by the receptionist/clerk and the social worker, the child was examined by Dr. Rodriguez, lab tests were performed, x-rays were taken, and the child was taken to a hospital room. Based upon the examination, it was Dr. Rodriguez' impression that the child had suffered a "post-traumatic abdominal injury possibly associated with internal injuries relating to pancreas, liver or an acute inflammatory process, pneumonia, etc." According to several medical experts, certain entries on the child's medical records during this time indicated that the child was being prepared for surgery, but subsequent entries indicated that the child was being transferred to another hospital.

Subsequent to the child's examination and Mrs. Gracia's interview, the social worker visited Mrs. Gracia in the child's hospital room. According to Mrs. Gracia, the social worker at that time (1) told her that they "did not qualify for the boy to stay there in that hospital," (2) suggested that the boy be transferred to John Sealy Hospital (a public hospital) in Galveston and that "he would be better off in Galveston and it would be much cheaper" and (3) instructed that she "had to sign" the "Consent to Transfer" form, which "was already filled out." According to the social worker, John Sealy Hospital in Galveston was "the place where we usually send people that cannot afford to pay." The social worker and Dr. Rodriguez testified that the transfer was recommended only when Mrs. Gracia refused to sign a surgical consent form and "wanted to talk to her husband." However, Mrs. Gracia testified that, if she had been presented a surgical consent form, she would not have refused to sign it and that she would not have waited to get the agreement of her husband. Mrs. Gracia also testified that she signed the "Consent to Transfer" form based upon the representations that her child would receive better care at better facilities with less costs at the Galveston hospital.

Once Mrs. Gracia signed the "Consent to Transfer" form and a physician with the Galveston hospital agreed to accept the child, the social worker made all necessary transportation arrangements for the transfer, Mrs. Gracia contacted by telephone Mr. Gracia at his place of work and he came to the hospital. Mr. and Mrs. Gracia and the minor child were then flown by air ambulance to Galveston, where they arrived around "5:00" p.m. that same day, July 23, 1979, and were taken immediately by ambulance to the Galveston hospital. While in the care of the physicians and staff at the Galveston hospital and without surgical intervention, the child died approximately eight days later on August 1, 1979. The medical experts had different opinions about the cause of death. The exact cause of death was undetermined.

Subsequently, appellees filed suit against numerous health care providers, including appellants. Following severances and dismissals, appellees proceeded to trial in this cause against Dr. Lorenzana and appellants Brownsville Medical Center and Valley Community Hospital.

Prior to the entry of judgment, the trial court found that certain damages awarded by the jury were excessive in the amount of $150,000.00 and ordered a remittitur of said amount. Based upon the finding of the jury, the trial court then rendered its judgment, which awarded damages in favor of appellees against Dr. Lorenzana, Brownsville Medical Center and Valley Community Hospital, jointly and severally, in the amount of $850,000.00 plus contribution rights, post-judgment interest and costs. Only appellants Brownsville Medical Center and Valley Community Hospital (and *not* Dr. Lorenzana) appeal from this judgment. We will consider Brownsville Medical Center's appeal first.

## BROWNSVILLE MEDICAL CENTER'S APPEAL

In its second point of error, Brownsville Medical Center asserts that there is no evidence or insufficient evidence to support the jury finding that Dr. Lorenzana's negli-

gence was a proximate cause of the death of appellees' child. The jury found that Dr. Lorenzana was negligent in (a) failing to properly or timely diagnose, (b) failing to properly or timely treat, (c) failing to administer appropriate medication, (d) not hospitalizing the child, (e) not consulting with a qualified medical specialist and (f) failing to properly interpret the lab tests and/or x-rays. On appeal, Brownsville Medical Center does not challenge the jury's finding regarding Dr. Lorenzana's negligence.

In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well established test set forth in *Glover v. Texas General Indemnity Company*, 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar*, 395 S.W.2d 821 (Tex.1965); *Allied Finance Company v. Garza*, 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); CALVERT, *No Evidence and Insufficient Evidence Points of Error*, 38 Texas L.Rev. 361 (1960).

The vital inquiry in any case involving proximate cause is whether the negligent act(s) set in motion a natural and unbroken chain of events that led directly and proximately to a foreseeable injury or result. *Hart v. Van Zandt*, 399 S.W.2d 791 (Tex. 1965).

The Texas Supreme Court in *Clark v. Waggoner*, 452 S.W.2d 437 (Tex.1970), wrote:

The foreseeability element of proximate cause is established by proof that the actor as a person of ordinary intelligence and prudence should have anticipated the danger to others created by his negligent act, and the rule does not require that he anticipate just how injuries will grow out of that dangerous situation. [Citations omitted.] The act of a third person which intervenes and contributes a condition necessary to the injurious effect of the original negligence will not excuse the first wrongdoer if such act ought to have been foreseen. [Citations omitted.] An act wanting in ordinary care which actively aids in producing an injury as a direct and existing cause need not be the sole cause; but it must be a concurring cause and such as might reasonably have been contemplated as involving the result under the attending circumstances. [Citations omitted.] The test is not what the wrongdoer believed would occur; it is whether he ought reasonably to have foreseen that the event in question, or some similar event, would occur.

*Clark v. Waggoner*, 452 S.W.2d at 439–440.

The intervention of an unforeseen cause of injury does not necessarily mean there is a new and independent cause of such character as to constitute a superceding cause which will relieve a defendant from liability. An intervening cause, even if unforeseeable, may be a concurring cause of the injury if the chain of causation is continuous or unbroken. *Teer v. J. Weingarten, Inc.*, 426 S.W.2d 610 (Tex.Civ. App.—Houston [14th Dist.] 1968, writ ref'd. n.r.e.).

Appellant argues that the evidence is insufficient to establish the foreseeability element of proximate cause because, after he referred the child to a pediatrician, Dr. Lorenzana could not have reasonably contemplated "the chain of events that actually occurred would unfold." Appellant argues that "the actions which took place after [the child] left [Brownsville Medical Center] were a new and independent intervening cause" of the child's death because (1) the chain of causation was broken since the intervention of the pediatrician and, subsequently, "the intervening situation at [Valley Community Hospital] operated independently of Dr. Lorenzana and was not a normal result" of Dr. Lorenzana's negligence, but rather (2) the "failure to carry through with the treatment set in motion by" the pediatrician, and not Dr. Lorenzana's negligence, was the "efficient cause" of the child's death.

There is medical expert testimony in the record to indicate that, at the time the child was examined by Dr. Lorenzana in the emergency room at Brownsville Medical Center, (1) the child exhibited signs of appendicitis, as well as hepatitis and pan-

creatitis, and (2) the child's x-rays, which were reviewed by Dr. Lorenzana prior to the child's release from the emergency room indicated that the child had appendicitis. Also there is medical expert testimony to indicate (1) that the child should have been hospitalized for observation, (2) that, between the time of Dr. Lorenzana's examination in the emergency room at Brownsville Medical Center and the time of Dr. Manarrez's examination at his office, the child's abdomen became "acute" from a ruptured appendix or other organ and (3) that, if the child had been hospitalized and observed, the child's "acute" condition could have been promptly ascertained and the child could have received prompt medical treatment, including possible surgical intervention.

■ We find that, from the medical expert testimony, the jury could have concluded (1) that Dr. Lorenzana's failure to properly diagnose and to treat and/or hospitalize the child resulted in a delay of proper diagnosis and medical treatment (2) that, during this delay, the child's condition, which was unsupervised, became aggravated or "acute" and (3) that the development of the child's aggravated or "acute" condition, without supervision and prompt medical attention, may have hindered subsequent diagnosis and treatment. Also, we find that the jury could have concluded that injury to the child from Dr. Lorenzana's negligence, as found by the jury, was reasonably foreseeable. In addition, based upon the facts of the case, we hold that, since the chain of causation was continuous and unbroken, Dr. Lorenzana's negligence was a concurring cause of the child's death and that the subsequent medical action or inaction did not constitute a "new and independent intervening cause," which would excuse Dr. Lorenzana from liability. Therefore, the evidence was sufficient to show Dr. Lorenzana's negligence was a proximate cause of the death of the child. Brownsville Medical Center's second point of error is overruled.

In its first point of error, Brownsville Medical Center asserts that the evidence was insufficient to support the trial court's conclusion of law that Dr. Lorenzana was the "ostensible agent" of Brownsville Medical Center. The jury found (1) that Brownsville Medical Center held itself out to the general public as providing to the public reasonable emergency care services including the availability of reasonably competent emergency room physicians and (2) that appellees relied upon said representations by Brownsville Medical Center.

An "apparent" or "ostensible" agent has been defined as "one whom the principal, either intentionally or by want of ordinary care, induces third persons to believe to be his agent, though he has not, either expressly or by implication, conferred authority on him." *Walter E. Heller & Co. v. Barnes*, 412 S.W.2d 747 (Tex.Civ.App.—El Paso 1967, writ ref'd. n.r.e.). Restatement (Second) of Agency § 267 (1958) sets forth the following rule of "apparent" or "ostensible" agency applicable to this case;

§ 267. Reliance upon Care or Skill of Apparent Servant or Other Agent

One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

Furthermore, Restatement (Second) of Torts § 429 (1966) provides:

§ 429. Negligence in Doing Work Which is Accepted in Reliance on the Employer's Doing the Work Himself

One who employs an independent contractor to perform services for another which are accepted in the reasonable belief that the services are being rendered by the employer or by his servants, is subject to liability for physical harm caused by the negligence of the contractor in supplying such services, to the same extent as though the employer were supplying them himself or by his servants.

The record reflects the following: Robert Carey, the administrator for Brownsville Medical Center, testified that his responsibilities included making the necessary arrangements for emergency room physicians to be available at Brownsville Medical Center and that Brownsville Medical Center contracted with Dr. Brady Fleming to provide emergency room physicians to staff the emergency room at Brownsville Medical Center. Dr. Lorenzana, the emergency room physician who saw the child at the emergency room at Brownsville Medical Center, was hired and paid by Dr. Fleming. Dr. Lorenzana stated that, a person would seek treatment at the emergency room at Brownsville Medical Center, he would never ask for an emergency room physician by name but rather would simply ask for a doctor to treat him. Dr. Fleming testified that there was no way for a patient who sought medical care at the emergency room of a hospital to know whether the emergency room physician was an independent contractor. Dr. Fleming further testified that Brownsville Medical Center directly billed patients for the services of the emergency room physician as well as other services.

Mrs. Gracia testified that the child was taken to the emergency room at Brownsville Medical Center "because we wanted him to have the best attention" and because she knew that there would be a physician to render treatment.

After reviewing the entire record, we find that the evidence is sufficient to support the jury's findings, upon which the trial court properly predicated its conclusion of law that Dr. Lorenzana was the ostensible agent of Brownsville Medical Center, and that, accordingly, Brownsville Medical Center was vicariously liable for Dr. Lorenzana's negligence, as found by the jury. *Schagrin v. Willmington Medical Center, Inc.*, 304 A.2d 61 (Del.1973); *Howard v. Park*, 195 N.W.2d 39 (Mich. 1972); *Mduba v. Benedictine Hospital*, 52 App.Div.2d 450, 384 N.Y.S.2d 527 (1976); *Adamski v. Tacoma General Hospital*, 20 Wash.App. 98, 579 P.2d 970 (1978); *See*

*Almar-York Co. v. Fort Worth National Bank*, 374 S.W.2d 940 (Tex.Civ.App.—Fort Worth 1964, writ ref'd. n.r.e.). Brownsville Medical Center's first point of error is overruled.

Brownsville Medical Center's third point of error will be discussed in connection with Valley Community Hospital's sixth point of error below.

### VALLEY COMMUNITY HOSPITAL'S APPEAL

In its first through fourth points of error, Valley Community Hospital challenges the legal and factual sufficiency of the evidence to support the jury's findings that Valley Community Hospital was negligent (1) in stopping medical care and treatment to the child after his admission and (2) in transferring the child to John Sealy Hospital in Galveston. Also, in its seventh point of error, Valley Community Hospital asserts that there was insufficient evidence to support the jury's finding that the negligence of Valley Community Hospital was the proximate cause of the death of the child. Valley Community Hospital contends that it should not be "vicariously liable for Dr. Rodriguez' error, if any, in ordering the patient transferred to a specialty hospital in Galveston" because the evidence is insufficient to support the conclusion that Dr. Rodriguez is "an agent, employee, or representative of this hospital."

However, contrary to Valley Community Hospital's position, the underlying question here is not whether Valley Community Hospital should be held vicariously liable for the negligence, if any, of Dr. Rodriguez but rather whether Valley Community Hospital breached a duty it, as a hospital, owed the child by stopping medical care and treatment and in transferring the child to the Galveston hospital.

In *Valdez v. Lyman-Roberts Hospital Inc.*, 638 S.W.2d 111 (Tex.App.—Corpus Christi 1982, writ ref'd. n.r.e.), our Court, citing 35 A.L.R.3d 841 (1971), noted that, while a private hospital may conduct its business largely as it sees fit, liability on

the part of the hospital may be predicated on the refusal of service to a patient in the case of an unmistakable emergency if the patient has relied upon the custom of the hospital to render aid in such a case.[2] However, unlike the situation in *Valdez* where a hospital refused to admit a seriously ill woman for treatment because she was not the patient of any doctor on the staff at the hospital, the child in the instant case (1) was a patient of Dr. Rodriguez who had staff privileges at Valley Community Hospital, (2) was admitted to the hospital under its "direct admission" process, (3) was examined by Dr. Rodriguez and (4) was, according to medical expert testimony, being prepared for surgery by hospital personnel, before the child's medical care and treatment was terminated and the transfer was ordered.

Restatement (Second) of Torts § 323 provides the following:

§ 323. Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

Comment (c) to Restatement (Second) of Torts § 323 provides:

c. Termination of services. The fact that the actor gratuitously starts in to aid another does not necessarily require him to continue his services. He is not required to continue them indefinitely, or even until he has done everything in his power to aid and protect the other. The actor may normally abandon his efforts at any time unless, by giving the aid, he has put the other in a worse position that he was in before the actor attempted to aid him. His motives in discontinuing the services are immaterial. It is not necessary for him to justify his failure to continue the services by proving a privilege to do so, based upon his private concerns which would suffer from the continuance of the service. He may without liability discontinue the services through mere caprice, or because of personal dislike or enmity toward the other.

*Where, however, the actor's assistance has put the other in a worse position than he was in before,* either because the actual danger of harm to the other has been increased by the partial performance, or *because the other, in reliance upon the undertaking, has been induced to forego other opportunities of obtaining assistance, the actor is not free to discontinue his services where a reasonable man would not do so. He will then be required to exercise reasonable care to terminate his services in such a manner that there is no unreasonable risk of harm to the other, or to continue them until they can be so terminated.* (Emphasis added.)

There is medical expert testimony in the record which indicates that, at the time of his admission to Valley Community Hospital, the child suffered from acute appendicitis, for which surgery was required. Also, there is evidence which shows that, disregarding motives, an employee (the social worker) of Valley Community Hospital recommended the transfer and that, in reliance upon certain representations by the social worker, Mrs. Gracia agreed to the transfer of her child to the Galveston hospital. Furthermore, there is medical expert testimony to indicate (1) that the child was

---

2. *See* Weigel and Mayo, Medicine, Money, Morality and Law: The Question of Access to Emergency Health Care, 24 So.Tex.L.J. 125 (1983) for an excellent discussion of the manner in which courts of different jurisdictions have applied (in hospital liability cases involving refusal or termination of hospital emergency care services) the above rule noted in *Valdez*, with and without the reliance requirement, as well as other rules, including Restatement (Second) of Torts § 323 (noted below).

imprudently discharged and transferred to the Galveston hospital and (2) that the discontinuance of medical care and treatment for the child and the delay resulting from the child's transfer to the Galveston hospital subjected the child to a greater risk of harm, which contributed to the child's death. Although there is evidence that Dr. Rodriguez in exercising his professional judgment ordered the transfer, there is also evidence from which the jury could have concluded that the hospital staff, including the social worker, after ascertaining that appellees were unable to pay for the services to be rendered, actively participated in the actual decision to discharge and transfer the child.

■ We conclude that Valley Community Hospital had an independent duty to the child not to negligently allow the termination of services to the child's detriment. We hold that there is sufficient evidence upon which the jury could have based its finding that Valley Community Hospital was negligent in stopping medical care and treatment to the child after his admission and then transferring the child to John Sealy Hospital in Galveston. Also, we hold that the evidence was sufficient to support the jury's finding that Valley Community Hospital's negligence was a proximate cause of the death of the child. Valley Community Hospital's first through fourth and seventh points of errors are overruled.

In its fifth point of error, Valley Community Hospital asserts that the trial court abused its discretion in allocating time for jury argument to the parties and in refusing Valley Community Hospital additional time to respond to plaintiff's argument.

At the conclusion of the presentation of evidence, the trial court allocated the following times for jury argument of the parties: (1) appellees—45 minutes; (2) Valley Community Hospital—15 minutes; (3) Brownsville Medical Center—15 minutes; (4) Dr. Lorenzana—10 minutes; and, (5) Dr. Fleming—5 minutes. After the trial court allocated time for jury argument, Valley Community Hospital objected to its allot-

ment of time for argument on the basis that "I have an extra issue being submitted concerning punitive damages against my client which would require additional argument on my behalf." The trial court overruled the objection and further denied Valley Community Hospital's request for additional time to argue regarding punitive damages.

■ TEX.R.CIV.P. 269 governs arguments to the jury. TEX.R.CIV.P. 269 does not prescribe the proper manner of allocation of time for jury argument; rather, TEX.R.CIV.P. 269(a) provides that the trial court shall "prescribe the order of argument between them," leaving to the trial court's discretion the amount of time to be allocated to each party for argument. The trial court is allowed wide discretion in allocating time for jury argument. *Aultman v. Dallas Railway & Terminal Company*, 152 Tex. 509, 260 S.W.2d 596 (Tex. 1953); *Aetna Casualty Surety Company v. M.E. Shiflett*, 593 S.W.2d 768 (Tex.Civ. App.—Texarkana 1979, writ ref'd. n.r.e.). The action of the trial court in exercising its discretion in allocating time for jury argument should not be overturned in the absence of a showing that such allocation was arbitrary, unreasonable or constituted an abuse of discretion. *Pirrung v. Texas and New Orleans Railway Company*, 350 S.W.2d 50 (Tex.Civ.App.—Houston 1961, no writ). Also, the trial court's exercise of discretion will not be disturbed without an affirmative showing of injury to the complaining party. TEX.R.CIV.P. 434.

■ The record reflects that the jury did not assess punitive damages against Valley Community Hospital; therefore, we hold that there is no harm shown to have resulted from this trial court's failure to allow Valley Community Hospital additional time to argue punitive damages. Also, although it appears that, in view of the number of issues and sub-issues to be argued by Valley Community Hospital, the trial court could have alloted Valley Community Hospital more time for argument, we cannot say that the trial court abused its discre-

tion in not doing so. Valley Community Hospital's fifth point of error is overruled.

In Brownsville Medical Center's third point of error and in Valley Community Hospital's sixth point of error, both appellants assert that the trial court erred in permitting appellees' counsel to argue actual damages in his closing argument when actual damages had not been discussed in the opening argument of appellees' counsel or in the arguments of defense counsel.

During his opening argument, appellees' counsel reviewed the evidence relating to liability issues and then, at the conclusion of the opening argument, urged the jury to award punitive damages against Valley Community Hospital.

Following appellees' opening argument, defense counsel then made their arguments, primarily responding to appellees' arguments relating to liability issues; except, defense counsel for Valley Community Hospital did respond by discussing the punitive damages issue asserted against it by appellees. No defense counsel discussed actual damages.

Subsequently, appellees' counsel began his closing argument. During his closing argument, appellees' counsel first mentioned actual damages. At that time, defense counsel objected on the basis that appellees' counsel should not be permitted to discuss actual damages at that time because actual damages had not been argued during the opening argument and during arguments of defense counsel. The trial court overruled the objections of defense counsel on the basis that "no defendant made any requests there be a full opening" argument. Defense counsel then made requests for additional time for argument in response to any comments made by appellees' counsel regarding actual damages. The trial court denied the requests.

Valley Community Hospital argues that the trial court made its ruling to allow the closing argument regarding actual damages based "on an erroneous assumption that the defendant had a burden to move the Court in this case for a more complete opening" and that "[n]o credible argument can be made that Valley Community Hospital 'provoked' or 'invited' this erroneous concluding argument." Also, Valley Community Hospital argues that the trial court, by overruling Valley Community Hospital's objection to "this erroneous concluding argument," "actually *bolstered* the erroneous argument" and "planted in the jury's mind an impression that Plaintiff's suggested damage amounts were probably reasonable and reflective of the evidence."

■ We hold (1) that appellants' counsel failure to move, before beginning their arguments, for an order compelling appellees' counsel to fully open waived their objections thereto, 3 McDonald, Texas Civil Practice, § 13.03 (revised 1983), (2) that the trial court's ruling did not amount to a bolstering of appellees' counsel's closing argument; and (3) that no "probable effect" from appellees' counsel's alleged erroneous concluding argument has been shown. Consequently, we find no reversible error. Brownsville Medical Center's third point of error and Valley Community Hospital's sixth point of error are overruled.

■ In its eighth point of error, Valley Community Hospital asserts that the trial court erred in refusing to submit a requested instruction which required the jury to predicate its finding of proximate cause *only* on testimony of expert witnesses based on reasonable and medical probability. As noted above, there is sufficient evidence upon which the jury could have concluded that Valley Community Hospital's negligence was a proximate cause of the death of the child. The *only* evidence, upon which said finding could have been based, was *medical expert* testimony that the delay in treatment, following the termination of medical care and treatment by Valley Community Hospital was detrimental to the child and contributed to the death of the child. Therefore, we hold that the error, if any, of the trial court in refusing to submit the requested instruction was harmless. TEX.R.CIV.P. 434. Valley

Community Hospital's eighth point of error is overruled.

In its ninth through twelfth points of error, Valley Community Hospital asserts (1) that the evidence was insufficient to prove some physical manifestation of appellees' mental pain and anguish to support the jury's award for such damages and (2) that the jury awards for (a) appellees' pecuniary loss (earnings and contributions by the child to appellees), (b) appellees' loss of companionship and society of. their child and mental pain and anguish and (c) the child's conscious physical pain and mental pain and anguish suffered before his death, with and without the trial court's remittitur, was so excessive as to be the result of passion and prejudice.

On appeal, jury findings awarding damages will not be disturbed on grounds of excessiveness if there is any probative evidence to sustain the award, unless the record shows the minds of the jurors were influenced by passion, prejudice or improper motive, and the award is so excessive that it shocks the conscience of this Court. *International Armament Corp. v. King*, 674 S.W.2d 413 (Tex.App.—Corpus Christi 1984), affirmed, 686 S.W.2d 595, (Tex.1985); *Hernandez v. Braddock*, 641 S.W.2d 359, (Tex.App.—Corpus Christi 1982, no writ); *Texas Construction Service Co. of Austin, Inc. v. Allen*, 635 S.W.2d 810 (Tex.App.—Corpus Christi 1982, writ ref'd. n.r.e.).

■ Damages for loss of companionship and society and for mental pain and anguish are recoverable by a parent for the death of a minor child. *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983); *City of Houston v. Stoddard*, 675 S.W.2d 280 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd. n.r.e.).

The record reflects the following: The child was the oldest of appellees' five children and was their first born son. He was described as a healthy child and "a happy child, he liked music, and he was always willing to help anybody." Mrs. Gracia testified that he would often help clean "around the house." The child was also described as "a playful child and naughty child like any other child" but "a good son." According to Mr. Gracia, the child "loved us and I loved him very much." Also, the child had said that, "[s]ince we never owned a car, the first thing he was going to do was help get us a car" "when he got older."

The record also reflects the following: Appellees' witnessed their child's condition progressively worsen. During the time the child was hospitalized at the Galveston hospital, appellees lived and slept in the Galveston hospital waiting room. There, the parents appeared "obviously extremely frightened" and expressed to social workers at the Galveston hospital "a very high degree of concern" about their child's condition. Although the family was stranded in Galveston without funds and family support, their principle worry was about their child. While at the Galveston hospital, both parents required medication for "their nerves." When the child died, both parents became "completely distraught about their son's death" and were "openly grieving." At that time, appellees were without funds to return themselves and their· deceased child to their home in Brownsville. Only through the efforts of a social worker at the Galveston hospital were appellees able to secure financial assistance necessary to return themselves and their deceased child to their home. According to the social worker, the aftermath of the child's death was truly a "horrifying" situation.

In addition, the record reflects the following: Mrs. Gracia stated that "[w]e miss him an awful lot. Every time we go some place, we know and feel we are missing someone." The evidence indicates that the child's death has affected appellees' life "quite a bit." The child was buried in "a family grave site" in Matamoros, Mexico, along with his grandfather, and the family visits the grave site "quite often."

Furthermore, the record is replete with subjective and objective indications that the child suffered much conscious physical pain

and mental pain and anguish while his condition progressively worsened prior to his death during the period of time in question.

After having reviewed the entire record, we hold that there is sufficient proof of physical manifestation of appellees' mental pain and anguish to support the jury's finding of mental pain and anguish to the appellees and, furthermore, conclude that (1) the award of $100,000.00, after the trial court's remittitur, for appellees' pecuniary loss (earnings and contributions by the child to appellees) resulting from the death of their child, (2) the award of $500,000.00 for appellees' loss of companionship and society of their child and mental pain and anguish resulting from the death of their child and (3) the award of $250,000.00 for the child's conscious physical pain and mental pain and anguish suffered before his death were not so excessive as to be the result of passion and prejudice or to shock the conscience of this Court. Valley Community Hospital's ninth through twelfth points of error are overruled.

In its thirteenth point of error, Valley Community Hospital asserts that the trial court erred (1) in refusing to limit appellees' recovery (not including recovery of medical expenses) to $500,000.00 pursuant to TEX.REV.CIV.ANN. art. 4590i § 11.02 (Vernon Supp.1985) and (2) in holding that the damages limitation contained in Art. 4590i § 11.02 is unconstitutional. However, we have recently held that the damages limitation of Art. 4590i § 11.02 is unconstitutional. *Detar Hospital, Inc. v. Estrada*, 694 S.W.2d 359, (Tex.App.—Corpus Christi 1985, writ pending). Therefore, we hold that the trial court did not err in refusing to limit appellees' recovery pursuant to Art. 4590i, § 11.02 and in holding the damages limitation in Art. 4590i, § 11.02 unconstitutional. Appellant's thirteenth point of error is overruled.

The judgment of the trial court is AFFIRMED.