**Marty Howard POPE and Sally Bates Pope, Appellants,**

v.

**Holland ST. JOHN, M.D., Appellee.**

**No. 3–93–016–CV.**

Court of Appeals of Texas, Austin.

Aug. 11, 1993.

Rehearing Overruled Nov. 10, 1993.

*child* with clothing food, and shelter." Tex.Fam. Code Ann. § 14.04(a)(1), (2) (emphasis added).

Richard Schechter, Richard Schechter, P.C., Houston, for appellants.

Jim Ewbank, A. Allain Provosty, Ewbank & Harris, P.C., Austin, for appellee.

Before POWERS, KIDD, and B.A. SMITH, JJ.

POWERS, Justice.

Marty Howard Pope and Sally Bates Pope appeal from a summary judgment that they take nothing by their suit against Holland St. John, a physician. We will reverse the trial-court judgment and remand the cause to the trial court.

## THE CONTROVERSY

St. John, a board-certified internist, was "on call" at Central Texas Medical Center in San Marcos, Texas, when Mr. Pope came to the emergency room complaining of back pain and fever. The emergency-room physician, Virgilio Suarez, examined Pope and then consulted by telephone with St. John, who was at home. Suarez told St. John that he had received a patient for evaluation of fever and back pain with a history of recent back surgery and epidural injections. Because St. John's area of specialization was not neurology or neurosurgery, and the Center was not able to handle cases involving those specialties, St. John recommended that Pope be referred to a hospital with the requisite neurosurgeon or to the physician who had performed the surgery. St. John had no further connection with Pope.

Pope withdrew from the Center against medical advice after a Round Rock, Texas, hospital refused to admit him. The following day, Pope was transported by ambulance to an Austin hospital. There a lumbar puncture revealed that he suffered from meningitis. About a month later, Pope was admitted to another Austin hospital for treatment of the meningitis and certain resulting, permanent disabilities. Mr. and Mrs. Pope sued St. John, among others, alleging that his negligence was a proximate cause of Pope's suffering and disabilities.

St. John moved for summary judgment on the following grounds: (1) he never diagnosed, cared for, or treated Pope and thus no physician-patient relationship existed between them; (2) without such a relationship, St. John owed Pope no duty of care upon which he might found a claim of negligence. The trial court sustained the motion, rendered judgment accordingly, and severed Pope's action against St. John from his actions against others. This appeal ensued.

## DISCUSSION AND HOLDINGS

The Popes bring a single point of error, contending the trial court erred in granting the summary judgment. *See Malooly Bros., Inc. v. Napier,* 461 S.W.2d 119, 121 (Tex. 1970).

St. John declined to see, examine, or treat Pope and relies upon the following legal principle to reach his conclusion that he owed Pope no duty of care:

> It is a well established principle of law that a physician is liable for malpractice or negligence *only* where there is a physician/patient relationship *as a result of a contract,* express or implied, that the doctor will treat the patient with proper professional skill, and there is a breach of professional duty to the plaintiff.

*Salas v. Gamboa,* 760 S.W.2d 838, 840 (Tex. App.—San Antonio 1988, no writ) (emphasis added). This means, according to St. John, that the scope of a physician's duty is limited to those with whom he contracts, expressly or impliedly, regarding treatment; and since St. John declined to contract with Pope, the latter fell outside the scope of St. John's duty. We disagree that St. John was entitled to summary judgment on this theory. As shown below, persons may come under a legal duty to others irrespective of a contract or other legal relation, and we find no reason or authority for exempting physicians, as a class, from these general rules of negligence law. And, as we shall see below, the summary-judgment record shows that St. John did more than simply decline contract relations with Pope.

## I.

The law imposes upon all persons, physicians not excepted, a duty to act as a reasonably prudent person would act under the same or similar circumstances, considering any reasonably foreseeable risk or probability of injury to others. The duty is a general one:

> *Whether or not* there is a pre-existing privity in legal relationship between the act and the person injured, if the circumstances are such that a person of ordinary

common sense would recognize that if he did not exercise reasonable care in his conduct with regard to those circumstances, his acts would place another person in danger, the duty to use ordinary care to avoid such danger arises.

*Bennett v. Span Indus., Inc.,* 628 S.W.2d 470, 474 (Tex.App.—Texarkana 1982, writ ref'd n.r.e.) (emphasis added). Irrespective of any contract relationship between St. John and Pope, the law imposed upon St. John a duty to act with ordinary care toward Pope if the circumstances were such that a reasonably prudent person in St. John's position would recognize that his acts, unless done with ordinary care, would place Pope in danger. This formulation of St. John's duty should not be confused with the proof required to establish its included elements.

■ In an affidavit accompanying his motion for summary judgment, St. John stated that he was "familiar with the standards of care" applicable in the vicinity to "on call internists who are presented with patients suffering from neurosurgical problems." [1] The standards are, he said, as follows: (1) on receiving a telephone call from the emergency-room physician, the internist should *"obtain* a thorough history from" that physician, regarding the patient; (2) *determine* from the patient history if the on-call internist has the specialty qualifications necessary to treat the patient properly; (3) *determine* if the hospital has adequate facilities to treat the patient's problem and, if not, whether to transfer him to another hospital having adequate facilities; and (4) *indicate* to the emergency-room physician the need to transfer the patient and *suggest* a specific hospital with the required facilities. "This is exactly the action I took," St. John declared in his affidavit, "notwithstanding there was no patient-physician relationship." This comment implies a very narrow view of what constitutes a "patient-physician relationship"; the circumstances suggest at least an implied contract with someone that St. John would

take the actions he believes he was *obliged* to take and did in fact take. *See Dougherty v. Gifford,* 826 S.W.2d 668, 674–75 (Tex.App.—Texarkana 1992, no writ).

In any event, St. John's affidavit implicitly concedes that he owed Pope a duty to identify his ailment, from a thorough medical history, in order that St. John might determine *if* the ailment fell within his qualifications to treat and if it could be treated at the Center. In addition, the affidavit concedes that St. John actually undertook to perform those duties even in the absence of a contract imposing them. As discussed below, the Popes' response to St. John's motion for summary judgment included the affidavit of another board-certified internist who declared, in effect, that St. John did not perform with ordinary care *precisely these admitted duties,* resulting in a misidentification of Pope's ailment and a mistaken conclusion as to the qualifications and facilities necessary to treat that ailment. Finally, St. John's affidavit declares his conclusions that Pope's ailment required the qualifications of a neurosurgeon (rather than those of an internist such as himself) and facilities that the Center did not have.

The other board-certified internist was Robert Levine. In his affidavit, he pointed to the fact that Suarez told St. John, over the telephone, that Pope carried a fever at the time and that he had recently had back surgery. Given such information, Levine declared, "Dr. St. John, or any other board certified internist, should have recognized the possibility of an infectious process, given a history of fever following an invasive procedure." *This assumes the standard of care St. John believed applicable and actually followed* by identifying Pope's ailment in order to reach a conclusion about St. John's qualifications and the hospital facilities required. Levine added: "Meningitis is a devastating disease, and its prognosis has been clearly shown to depend on the rapidity with which a diagnosis can be made and treatment

---

1. One should note St. John's affidavit *assumes,* in this regard, that the patient suffers "from neurosurgical problems." Thus, his statement of the physician's "standards of care" does not meet the case where the patient may have had back surgery but has symptoms of an infection, which might indicate meningitis. The summary-judgment record shows that such was Pope's condition as reported to St. John by Suarez. Although an opposing affidavit speaks to *this* situation, St. John's affidavit does not.

instituted." A timely diagnosis of Pope's actual ailment would have precluded "the devastating permanent complications" he suffered.

■ By *undertaking* affirmatively to identify Pope's ailment based on the information supplied by Suarez, St. John assumed a legal duty to act with ordinary care in arriving at his identification and his consequent determination of whether he was qualified to treat the ailment. This is true even if St. John acted voluntarily, that is to say, free of any contract or common-law obligation to act. *See Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983) ("One who voluntarily enters an affirmative course of action affecting the interests of another is regarded as assuming a duty to act and must do so with reasonable care."). Levine's affidavit expressed his opinion that St. John breached his duty by assuming, in the face of the contrary factors of fever and recent surgery, that Pope's condition had a non-infectious origin.

The foregoing was at least sufficient to preclude judgment as a matter of law that St. John had no duty to Pope in the circumstances, irrespective of whether there was a patient-physician relationship.

## II.

Levine's affidavit also disagreed with St. John regarding the "standard of care" owed by an internist in St. John's circumstances. Levine stated that St. John should have seen Pope personally, in light of the information relayed by Suarez, and performed a lumbar puncture that would have permitted a correct identification of Pope's ailment, a procedure "clearly within the domain of ... an internal medicine specialist." This refers to the information supplied by Suarez to the effect that Pope carried a fever and had undergone recent back surgery.

■ After reaching his conclusions based on the information given by Suarez, St. John was free of any obligation to perform any further services in Pope's behalf, such as conducting a personal examination, *unless* Pope would be placed in a worse position than before. "A person is put in a worse position if the actual danger to him has been increased by the partial performance, or *if in reliance he has been induced to forego other opportunities of obtaining assistance.*" *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 397 (Tex.1991) (emphasis added), citing *Brownsville Medical Ctr. v. Gracia,* 704 S.W.2d 68, 76 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.) (hospital has duty not to allow negligent termination of medical services supplied patient).

■ Levine's affidavit and other parts of the summary-judgment record suggest that the Popes relied upon St. John's erroneous identification by attempting to obtain Pope's admission to a hospital having neurosurgical physicians and facilities, resulting in a delay that permitted the meningitis to inflict serious permanent injuries upon Pope. The summary-judgment record did not establish the contrary as a matter of law; hence, the record failed to establish as a matter of law that St. John owed the Popes no legal duty upon which liability might be predicated.

## III.

■ St. John apparently argues that the Medical Liability and Insurance Improvement Act, Tex.Rev.Civ.Stat.Ann. art. 4590i, § 1.03(a)(4), (6) (West Supp.1993), precludes any cause of action against St. John outside the context of a duty arising from a contract for medical care made between St. John and Pope. We do not so interpret the statute. *See Martin v. Petta,* 694 S.W.2d 233, 237–38 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.).[2]

---

**2.** The Popes' live petition alleged that St. John "violated the duty owed to Plaintiffs to exercise the ordinary care and diligence exercised by physicians ... in the same or similar circumstances and [was] negligent in [his] treatment of Marty Howard Pope." They may also have invoked the terms of article 4590i for they alleged that under § 4.01(a) of that statute "some defendants were

given at least 60 days notice" of the Popes' intent to file a health care liability claim. In the *Petta* decision, the court rejected the idea that the plaintiff relinquished her claim for common-law negligence by invoking the terms of article 4590i, which limits in § 7.01 the application of the doctrine of res ipsa loquitur. The court stated that "a plaintiff is not automatically precluded

For the reasons given, we hold the trial court erred in awarding St. John judgment as a matter of law. We therefore reverse the judgment and remand the cause to the trial court.

from pleading a cause of action in common law negligence, but in a proper case may plead a cause of action in common law negligence and also rely upon the common law doctrine of res ipsa [loquitur]." *Petta,* 694 S.W.2d at 238. The

Popes' action against St. John does not rely upon res ipsa loquitur but upon simple negligence, which they showed prima facie in the summary-judgment record.