NUMBER 13-03-427-CV

 

                         COURT OF APPEALS

 

                     THIRTEENTH
DISTRICT OF TEXAS

 

                         CORPUS
CHRISTI - EDINBURG

 

COLUMBIA RIO GRANDE REGIONAL 

HEALTHCARE, L.P., D/B/A RIO GRANDE

REGIONAL HOSPITAL,                                                                  Appellant,

 

                                                             v.                                

 

ALICE H. HAWLEY AND JAMES A.
HAWLEY,                             Appellees.

 

       On
appeal from the 93rd District Court of Hidalgo County, Texas.

 

 

                                          O
P I N I O N

 

                      Before
Justices Rodriguez, Castillo, and Garza 

                                         Opinion
by Justice Garza

 













Columbia Rio Grande Healthcare, L.P., d/b/a Rio
Grande Regional Hospital, appeals from a judgment entered against it on a jury
verdict.  Ten issues are raised in this
appeal.  These fall into four general
categories:  (1) challenges to the
sufficiency of the evidence, (2) issues related to the admissibility of certain
expert testimony, (3) jury charge issues, and (4) issues related to damages and
to the pre- and post-judgment interest rates.[1]  To ensure that all issues necessary for final
disposition of the appeal are decided, we address the issues in a different
order than how they are presented by appellant. 
See Tex. R. App. P.
47.1.  Specifically, we begin with errors
that would require the rendition of judgment in appellant=s favor and then discuss errors that would require a
new trial.  Errors that would require
modification of the judgment will be discussed last.  We overrule all issues and affirm the
judgment of the trial court. 

Background

On November 22, 2000, Alice H. Hawley presented to
Armando Arechiga, M.D., her primary care physician, complaining of cramps,
nausea, and vomiting.  Dr. Arechiga
referred Mrs. Hawley for a Doppler exam. 
Upon learning the results of the exam, Dr. Arechiga sent Mrs. Hawley
directly to Rio Grande Regional Hospital (the AHospital@) for treatment of a perforated diverticuli.  On November 23, 2000, Jesus Rodriguez, M.D.,
performed a resection of Mrs. Hawley=s colon because of the ruptured diverticuli.  During the surgery, Dr. Rodriguez examined Mrs.
Hawley=s liver and detected no abnormalities.  Mrs. Hawley was discharged from the Hospital
on November 29, 2000. 

The excised portion of Mrs. Hawley=s colon was sent to Jose Valencia, M.D., a
pathologist whose office is located within the Hospital.  Dr. Valencia=s
examination of the tissue specimen revealed that Mrs. Hawley had cancer.  Dr. Valencia diagnosed Mrs. Hawley as having
adenocarcinoma of the colon with four of five lymph nodes being positive.  Dr. Valencia staged the cancer, in terms of
severity, as Stage 3 or what is known as ADuke=s C@ cancer. 

Mrs. Hawley did not learn that she had cancer until
October 2001, almost a full year after she was diagnosed by Dr. Valencia.  By that time, she had an inoperable tumor in
her liver that was roughly the size of a softball.  Mrs. Hawley was treated with chemotherapy by
Susan Escudier, M.D. and Billie Marek, M.D. 
Although her initial response to the chemotherapy was excellent, the
cancer was too far advanced to be cured. 
The treating physicians continued treatment in the hope of prolonging
Mrs. Hawley=s life for as long as possible.     








On February 26, 2002, Mrs. Hawley and her husband,
James A. Hawley, sued the Hospital. 
Their live petition alleged that the Hospital was negligent in failing
to timely and properly convey the cancer diagnosis to Mrs. Hawley, her surgeon,
Dr. Rodriguez, and her admitting physician, Dr. Arechiga.  The Hawleys also complained that the Hospital
had failed to follow its own polices and procedures in the reporting of
surgical pathology results. 

 The case was
tried to a jury, which returned a unanimous verdict that the Hospital=s negligence was a proximate cause of the injuries
and damages sustained by the Hawleys. 
The trial court entered a judgment on the verdict, and the Hospital
subsequently appealed the judgment to this Court.  

At the time of trial in February 2003, Mrs. Hawley=s life expectancy was approximately six months.  While the instant appeal was pending before
this Court, Mrs. Hawley succumbed to complications caused by her cancer.  Her husband continues in this matter as sole
appellee.           

I.  Challenges
to the Sufficiency of the Evidence 

In its sixth and eighth issues, the Hospital
contends that the evidence is insufficient to support the jury=s findings. 
The standards of review for legal and factual sufficiency challenges are
settled and will not be restated here.[2]
                                     

A.  The Jury=s Answer to Question One  








In its sixth issue, the Hospital contends that the
evidence is legally insufficient to support the jury=s affirmative answer to Question One, which asked, AWas the negligence, if any, of . . . the Hospital a
proximate cause of injuries to Alice H. Hawley?@  The Hospital argues that there was no
competent evidence that Mrs. Hawley had more than a 50 percent chance of
survival in November 2000 and that the evidence is therefore legally
insufficient to prove that the Hospital=s negligence was a proximate cause of Mrs. Hawley=s injuries.  

The Texas Supreme Court has explained that, in cases
such as this, the ultimate standard of proof on the issue of causation is
whether, by a preponderance of the evidence, a negligent act or omission is
shown to be a substantial factor in bringing about the harm and without which
the harm would not have occurred.  Park
Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995); Kramer
v. Lewisville Mem=l Hosp.,
858 S.W.2d 397, 400 (Tex. 1993); Duff v. Yelin, 751 S.W.2d 175, 176
(Tex. 1988).  Put simply, it must be Amore likely than not@ that
the ultimate harm or condition resulted from the defendant=s  negligence.  Kramer, 858 S.W.2d at 400.  Thus, recovery is barred if the defendant=s negligence deprived the patient of only a 50
percent or less chance of survival.  Milo,
909 S.W.2d at 511; Kramer, 858 S.W.2d at 400.

 Much of the
trial focused on Mrs. Hawley=s chances of survival in November 2000, when Dr.
Valencia initially diagnosed her with cancer. 
Both sides produced expert medical testimony to explain how colon cancer
is staged and what the various rates of survival are for the different stages.[3]  The uncontradicted testimony established
that, if Mrs. Hawley had been fully evaluated following her initial diagnosis,
her cancer would have been staged at either ADuke=s C@ or ADuke=s D.@    








Patients afflicted with cancer staged at Duke=s C and Duke=s D have markedly different rates of survival.  Dr. Escudier testified that the survival rate
for Duke=s C patients who are properly treated is between 40
and 60 percent.  She believes that the
rate is actually closer to 60 percent, but she acknowledges the existence of
older studies that place the rate below 50 percent.  Dr. Escudier attributes the discrepancy
between the old and new studies, in part, to improvements in imaging
technology.  With better imaging,
patients are staged more accurately, meaning fewer patients with Duke=s D are incorrectly staged at Duke=s C.  Thus, in
Dr. Escudier=s opinion, the actual survival rate has not
necessarily improved for Duke=s C patients. 
The survival rate has improved statistically, in part, because fewer
patients with more advanced cancer are mistakenly staged at Duke=s C, which has led to an overall increase in the
survival rate for Duke=s C patients. 

Dr. Escudier=s estimate of the survival rate was supported by the
opinions of the other oncologists who testified at trial.  For instance, Dr. Marek estimated the
survival rate for Duke=s C to be approximately 65 percent.  Even Eric Raefsky, M.D., an oncologist from
Nashville, Tennessee, who was called as an expert witness by the Hospital,
agreed with Dr. Escudier:  A[I]f you look at groups of patients as a whole
prospectively, an average Duke=s C colon cancer patient treated with adjuvant
chemotherapy, a five-year survival or overall survival of 60 percent seems
reasonable to me.@  

There was also very little disagreement about the
survival rate of patients suffering from Duke=s D
cancer.   Their prognoses range from zero
to 30 percent.








 The main
dispute at trial was whether Mrs. Hawley had Duke=s C or
Duke=s D cancer in November 2000.  The Hawleys maintained that the cancer was
Duke=s C, but the Hospital attempted to prove that Mrs.
Hawley had already developed the more advanced and less treatable Duke=s D.  In
attempting to prove their respective cases, both sides were frustrated by a common
problem:  Mrs. Hawley did not undergo a
full evaluation at the time of her initial diagnosis.  Instead, nearly 11 months elapsed before any
imaging was performed.  The
uncontradicted expert testimony produced at trial established that radiographic
imaging is a critical factor in accurately staging cancer.  Without confirming the existence of a new
tumor, a patient cannot be properly staged at Duke=s D.  That is,
a Duke=s D diagnosis requires confirmation that the cancer
has spread to a new location and formed a new growth area or tumor, which can
be identified visually and can be measured. 
In other words, the tumor must be clinically demonstrable.  Thus, in Mrs. Hawley=s case, the cancer could be properly staged at Duke=s D only if there was evidence of a tumor in her
liver.  At trial, the Hospital did not
offer any direct evidence to establish that a tumor was present in Mrs. Hawley=s liver on or before November 2000. 








Instead, the Hospital presented expert opinion
testimony that, given the large size of Mrs. Hawley=s tumor 11 months after her initial diagnosis, the
tumor must have been present in her liver when she was initially diagnosed back
in November 2000.  The Hawleys countered
with expert testimony explaining that the presence of some cancerous cells in a
secondary location does not necessarily warrant a Duke=s D diagnosis. 
In fact, all the oncologists who testified at trial recognized a
distinction between Amicrometastatic@ disease and Amacrometastatic@ disease. 
Micrometastatic disease signifies the migration of cancerous cells from
a primary growth area to other locations within the body, where the cells may
or may not ultimately form a new cancerous growth, depending on the ability of
the body=s immune system to defeat them.  Metastatic or macrometastatic disease means
that a new cancerous growth has been formed by the metastatic cells and that
the new growth is discernable and can be measured.  Essentially, it means that a new,
identifiable and demonstrable tumor has formed.    

All the oncologists who testified at trial agreed
that, at the time of her initial diagnosis, Mrs. Hawley suffered from at least
micrometastatic disease.  That is, they
agreed that the cancer had spread, at least microscopically, from Mrs. Hawley=s colon to her liver.  This condition is consistent with a Duke=s C diagnosis. 


Dr. Raefsky, the Hospital=s expert, took his opinion one step further.  He testified that a tumor was present in Mrs.
Hawley=s liver in November 2000 and that the tumor would
have been visible by proper imaging, meaning that Mrs. Hawley=s cancer had already progressed to Duke=s D.  Upon
further examination, Dr. Raefsky gave the following testimony:

Counsel for Hawleys:       Okay.  So the
reason that you=re equivocating, and I understand, is because no one
did follow up on Alice when she was diagnosed. 

 

No one followed up at that time, right?  She wasn=t staged?

 

Dr. Raefsky:             That is correct.

 

Counsel for Hawleys:       And you said we really don=t know if she had overt evidence of metastatic
disease in November of 2000 because nothing was done?  That=s what you said?

 

Dr. Raefsky:             That is correct.  Let me just say we do know that she had at
least micrometastatic disease in November of 2000.  

 








Counsel for Hawleys:       Right.  And my
experts agree with you on that, that she had to have had micrometastatic
disease because she eventually came down with metastasis that was identified as
originating in the bowel, correct, in the colon?

 

Dr. Raefsky:             Correct.

 

Counsel for Hawleys:       So we
know there was micrometastatic disease. 
What you=re saying is, we really don=t know if she had overt evidence of metastatic
disease in November of 2000?

 

Dr. Raefsky:             Correct.

 

Drs. Marek and Escudier, the oncologists who treated
Mrs. Hawley, gave similar testimony.  During
cross-examination by the Hospital=s attorney, Dr. Marek testified that he had Ano doubt@ that Mrs. Hawley had micrometastatic spread of her
adenocarcinoma of the colon in November 2000. 
Dr. Marek further testified that, in November 2000, the growth would not
have been measurable by any current radiographic means.  By definition, this limitation places Mrs.
Hawley=s cancer in the Duke=s C
category.       

Dr. Escudier also testified on the subject.  She testified that the cancer must have
spread by November 2000 because it was, in fact, later discovered in Mrs. Hawley=s liver.  What
cannot be known, according to Dr. Escudier, is whether the spread was
microscopic disease, meaning Duke=s C, or macroscopic disease, meaning Duke=s D.  Counsel
for the Hospital asked Dr. Escudier whether a Aspiral
CT scan@ would have shown a tumor in Mrs. Hawley=s liver in November 2000.  Dr. Escudier replied, AIt=s possible.  I
mean, you can=t say one way or another . . . I don=t know what her blood tests were.  I don=t know if the surgeon looked at her liver or not.@  Dr. Escudier
also gave the following testimony in which she maintained that a diagnosis
beyond Duke=s C could not be made based on the information
available:








Counsel for Hospital:        In retrospect,
now that we can look back a little bit over two years ago, we know she wasn=t Duke=s C at that time; is that your understanding?

 

Dr. Escudier:                       We don=t know that because we don=t have any liver imaging or liver exploration. 

 

Counsel for Hospital:        Is it reasonable
to assume that the liver cancer or the liver metastases was already present in
November of 2000 when the adenocarcinoma was removed from the colon?

 

Dr. Escudier:                       We don=t have any data to say [that] because she had no
scans done at that time. 

 

*   *    * 

 

Counsel for Hospital:        Okay.  You do agree with me that if somebody=s diagnosed with Duke=s D,
they have a much more grim prognosis for five-year survival than somebody with
Duke=s C?  Is that
correct?

 

Dr. Escudier:                       Yes.

 

Counsel for Hospital:        And by
definition, Duke=s D is where we know there is metastasis to another
organ?

 

Dr. Escudier:                       Yes.


 

Counsel for Hospital:        Do you
agree with me that in retrospect, now knowing that Ms. [sic] Hawley ends up
with a tumor of this size in her liver, she was, in fact, a Duke=s D in November of 2000, when the primary [growth]
was removed?

 

Dr. Escudier:                       But
again, the Duke=s D is based on either radiologic evidence or biopsy
evidence for metastatic disease, so  - - 

 

*    *    *  

 

Dr. Escudier:                       Which wasn=t done at that time.

 

Counsel for Hospital:        But in
retrospect?








Dr. Escudier:                       I
mean, there was - - like I said, there certainly was some cancer there.  How much cancer was there is pure
speculation. 

 

Counsel for Hospital:        But it
was there?

 

Dr. Escudier:                       Again,
every - - in 50 percent of Duke=s C [patients], the cancer has already spread at the
time it=s diagnosed. 

            

Testimony from Dr. Rodriguez, the surgeon who
operated on Mrs. Hawley in November 2000, was also offered at trial.  Dr. Rodriguez testified that he saw no signs
of cancer during the surgery.  He
examined Mrs. Hawley=s abdomen for other pathology but discovered no
indication of any abnormalities.  Dr.
Rodriguez specifically examined Mrs. Hawley=s
liver from within her body both visually and by palpating her liver with his
hands.  Dr. Rodriguez testified that such
procedures are useful in detecting Agross pathology,@
including tumors, but also testified that these practices were not 100 percent
effective.  

Based on a complete review of the record, we
conclude that there is legally-sufficient evidence to prove that Mrs. Hawley
had a greater than 50 percent chance of survival at the time of the Hospital=s negligence. 
In reaching this conclusion, we recognize that this case involved a
hotly-contested fact issue as to whether Mrs. Hawley=s cancer was Duke=s C or
Duke=s D in November 2000.  The Hawleys produced substantial
evidence  to prove that Mrs. Hawley=s cancer could not be staged beyond the Duke=s C category and that Mrs. Hawley=s chances of survival were therefore well above 50
percent.  This evidence included, among
other things, testimony from the two oncologists who treated Mrs. Hawley,
testimony from the surgeon who examined Mrs. Hawley=s liver and took the tissue sample that led to the
initial diagnosis of colon cancer, and testimony from the pathologist who made
the initial diagnosis.  








Notably, in presenting its sufficiency challenge to
this Court, the Hospital has neglected Dr. Rodriguez=s testimony regarding his examination of Mrs. Hawley=s liver in November 2000.  Dr. Rodriguez testified that his examination
uncovered no signs of gross pathology, that is, no signs of a tumor and thus no
signs of macrometastatic disease.  This
testimony, together with the other expert testimony produced at trial, strongly
indicates that Mrs. Hawley=s cancer had not advanced beyond Duke=s C and that her chances of survival at the time of
the Hospital=s negligence were approximately 60 percent. 

In conducting our review of the record, we have not
excluded from consideration the Hospital=s evidence on the issue.  The Hospital produced testimony from
pathologists and from its own oncologist to prove that, given average tumor
growth rates and the size of the tumor when it was finally treated, the tumor
must have been present in Mrs. Hawley=s liver and clinically demonstrable in November
2000.  Thus, according to the Hospital=s witnesses and evidence, Mrs. Hawley=s cancer had already advanced to Duke=s D and her chances of survival were below 50
percent. 

We find it noteworthy that none of the testimony
given by the Hospital=s witnesses tended to prove that either the  experts or their testimony were in any
respect incompetent or unreliable.  To
the contrary, the Hospital=s witnesses recognized the qualifications and
competency of the Hawleys= experts.  The
point of dissension among the experts was whether it was reasonable to use
statistics on the doubling times of tumors to estimate how large the tumor in
Mrs. Hawley=s liver was in November 2000.  The Hospital=s
experts suggested that such an approach was appropriate, but the jury also
heard testimony that the approach was unreliable and unreasonable.  In some instances, the mixed testimony came
from the Hospital=s own witnesses. 
For example, Dr. Raefsky testified as follows:








Counsel for Hawleys:       And you say you
know the growth rate of most colon cancers.

 

What - - are we going to get into that, about how
fast this cancer was growing inside Alice? 

 

Dr. Raefsky:             Again, you know, I
hope not.  Because, obviously, there is
conjecture.  And as I said here, you
know, I was talking about my experience with how colon cancers grow in most people.

 

The fact that we don=t know
a certainty in November of 2000 compared to October of 2001, you=re right. 
That certainly is conjecture on my part as to what I think is most likely
based on my experience of treating hundreds of colon cancer patients.  

 

Counsel for Hawleys:       Dr. Escudier seemed to think that it=s very difficult to predetermine generally the
growth rate of a colon cancer.  Do you
agree with that?

 

Dr. Raefsky:             Yes,
I do.

 

Counsel for Hawleys:       And in
this case, whether it was microscopic spread or just a nonpalpable lesion in
her . . . liver in November of 2000, we know it grew dramatically over the next
eight to ten months, don=t we?  It was
a dramatic increase in size?

 

Dr. Raefsky:             Again, we don=t know what the size of the lesion was and we don=t know how thoroughly Dr. Rodriguez palpated the
liver in the sense of he wasn=t doing a cancer surgery.  In other words, it certainly is quite
feasible that he did less than a thorough job because he felt he had no reason
to suspect cancer.

 

Counsel for Hawleys:       He won=t like to hear that, you know?

 

He thought he examined it pretty well according to
his deposition.   

 








But anyway, if there was a microscopic spread or if
there was a lesion there, say, one or two centimeters that he missed, we still
have to concede that that was a very aggressive tumor to have gotten the size
it did within 10 or 11 months, correct?

 

Dr. Raefsky:             Uh-huh.

 

Counsel for Hawleys:       You have
to say yes or no. 

 

Dr. Raefsky:             Yes.   

  

Although Dr. Raefsky initially relied on his
professional experience to support his opinion testimony that a cancerous
growth in Mrs. Hawley=s liver would have been clinically demonstrable in November
2000, he subsequently conceded that, to some extent, his testimony was based on
conjecture, rather than hard science, because of the difficulty in  determining the actual growth rate of
untreated cancer. 

The reasonableness of applying experiences such as
Dr. Raefsky=s, experiences with patients who are treated, to
estimate the growth rate of a tumor in an untreated patient, such as Mrs.
Hawley, became a heated fact issue for the jury.  It  was
again  raised by the Hospital on
cross-examination of William Anderson, M.D., a pathologist called as an expert
witness by the Hawleys.  Dr. Anderson=s testimony cast doubt on the value of Dr. Raefsky=s testimony, as well as the Hospital=s other evidence based on the doubling times of
tumors in patients who, unlike Mrs. Hawley, actually received treatment upon
diagnosis.

Dr. Anderson:         Well, the doubling time
is basically the growth rate, how long it takes that tumor to double.  The problem with that is that as the tumor
changes, this doubling time is going to change as well and it may go pretty
much off the chart because it=s going so fast. 

 








The other real problem with any statistics in the
doubling time in the literature is that all of those people are treated
patients.  Nobody finds a patient with a
tumor and says, well, we=re not going to treat you for ten months so we can
get you into the doubling stage.  It
doesn=t happen.  In
the medical care system, it doesn=t happen.  So
the group of the people you have in the statistics are treated patients.  So then we have to go to the - - outliers, as
I mentioned before, the ones that aren=t treated. 
That=s the difference in this tumor.  And that=s what we have in this situation.

 

On further cross-examination, Dr. Anderson explained
how, in his opinion, the Hospital=s retrospective staging of Mrs. Hawley=s cancerous liver growth was erroneous and improper
under the traditional methodology of cancer staging:

Counsel for Hospital:        We agree
that Ms. [sic] Hawley had at least micro metastases to the liver, correct?

 

Dr. Anderson:                     In all
likelihood.

 

Counsel for Hospital:        Micro metastases
to the liver would be a Duke=s D; is that correct?

 

Dr. Anderson:                     No.

 

Counsel for Hospital:        Metastases to the
liver would be a Duke=s D?

 








Dr. Anderson:                     No.  The stages were set up by what you actually
found.  That=s how they set it up.  So you can=t
speculate because the staging was set in all these statistics, okay, you know
there=s a tumor, it=s palpable at least in the liver.  If it=s less than that, then - - as we said, people have
these cells circulating all the time. 
But if it=s less than that, it=s a
C.  That=s just
the way it was clinically set up.  So you
can=t go back and say, well, because we think it might
be, we=ll call it a D. 
You can=t do that.  If
you can prove it=s there, it=s a D.  If you
don=t, it=s a C.  That=s how all the statistics are done.  So it=s erroneous to say, well, we think the micro
metastases is a D because the clinical criteria is being able to demonstrate
the metastases somewhere else and if you can=t do
that, you can=t say it is a D.

 

As the cross-examination continued, Dr. Anderson
testified that Dr. Rodriguez=s physical examination of Mrs. Hawley=s liver would have probably revealed a tumor if she
had macrometastatic disease of the liver in November 2000:

 

Counsel for Hospital:        So Dr. Valencia
was correct when he diagnosed - - first said this was a Duke=s C based on what he saw when the colon was removed;
is that correct?

 

*   *    *

 

But that=s all he saw was what was right there in the colon;
is that correct?

 

Dr. Anderson:                     Yes.

 

Counsel for Hospital:        There were no CT
scans done, no radiologic x-rays done. 
So nobody knows - - 

 

Dr. Anderson:                     Well,
that=s not exactly true. 
There was a physical examination of the liver by the surgeon in an area
in the hilum, which is a fairly thin thing, and would be able to - - fairly
readily palpate a descent [sic] size lesion there.  

 

Counsel for Hospital:        Descent
[sic] size.  What size is that?

 

Dr. Anderson:                     Centimeter
or so.

 

*   *    *

 

Counsel for Hospital:        We
agree that it=s not a hundred percent [accurate] when a surgeon
palpates the liver to see if he feels a tumor of some sort?

 

Dr. Anderson:                     Well,
nothing=s a hundred percent in medicine.                                                  

 

Counsel for Hospital:        Because it could
be deep down in the liver?








Dr. Anderson:                     That=s the point. 
It depends on where the tumor is in the hilum.  In the thin part of the liver, it comes down
into a wedge and where this tumor is probably about is that thick (indicating).  And, yeah, if there=s a mass, a firm mass there a centimeter across, you=re probably going to feel something there. 

 

Thus, both the Hospital and the Hawleys supported
their version of events with evidence, including expert testimony.  Of course, it is the jury=s role, as the finder of fact, to resolve conflicts
in the evidence.  City of Keller v.
Wilson, 168 S.W.3d 802, 820 (Tex. 2005). 
In a legal sufficiency review, we must assume that jurors resolved all
conflicts in accordance with the verdict. 
Id.  We have reviewed the
entire record in this case, and although we recognize the existence of a
hotly-contested issue of fact, we will not disturb the jury=s resolution of the conflicts and contradictions
presented by the evidence.  The evidence
detailed above adequately assures us that a reasonable and fair-minded juror
could find that Mrs. Hawley=s chances of survival were greater than 50 percent
at the time of the Hospital=s negligence. 
Accordingly, the Hospital=s sixth issue is overruled.            

B.  Reasonable
and Necessary Medical Expenses 

In its eighth issue, the Hospital contends that the
evidence is legally and factually insufficient to establish the reasonable and
necessary medical expenses awarded by the jury and modified by the trial
court.         








Mrs. Hawley=s medical bills were admitted into evidence, as were
affidavits by Dr. Marek and Eliseo Pina, the custodian of records for the South
Texas Cancer Center, the hospital where Mrs. Hawley was treated.  Mrs. Hawley=s
medical bills totaled $209,443.  The
affidavits by Dr. Marek and Mr. Pina asserted that the expenses reflected in
the medical bills were reasonable and necessary to treat Mrs. Hawley.  At trial, Dr. Marek testified that only
one-third of the medical expenses would have Aprobably@ been incurred if the Hospital had not been
negligent.  

The jury found that the Hospital=s negligence caused Mrs. Hawley to incur reasonable
and necessary medical expenses in the amount of $400,000.  The trial court reduced the award to
$139,628.67, an amount which equals two-thirds of Mrs. Hawley=s total expenses and is consistent with Dr. Marek=s testimony.

In two sub-issues, the Hospital contends that the
evidence is insufficient to support the final award because Dr. Marek used the
word Aprobably@ in his testimony and because Dr. Marek based his
estimate on the false assumption that Mrs. Hawley had not developed
macrometastatic disease at the time of the Hospital=s negligence. 
We overrule each sub-issue. 

1.  Certainty
of Testimony 

It is unclear what type of sufficiency challenge the
Hospital seeks to raise by its first sub-issue. 
The Hospital appears to generally assert that the word Aprobably@ renders expert opinion testimony incompetent or
otherwise inadmissible and therefore insufficient to establish the award for
reasonable and necessary medical expenses. 
We disagree. 

The supreme court has aptly addressed the
distinction between the various burdens of proof used at trial and what the
supreme court describes as Aproof of an absolute certainty@:








[I]n searching for truth, the law does not, and
should not, require proof of an absolute certainty of causation or any other
factual issue.  It always settles for
some lower threshold of certainty, whether beyond a reasonable doubt in criminal
law, clear and convincing evidence in certain civil matters involving
constitutional rights, or the more typical civil burden of reasonable
probability.

 

Kramer,
858 S.W.2d at 405.  

In medical malpractice cases, plaintiffs are
required to show evidence of a Areasonable medical probability@ or Areasonable probability@ that
their injuries were proximately caused by the negligence of one or more
defendants.  Milo, 909 S.W.2d at
511.  It is thus unremarkable and, in
fact, fully expected that Dr. Marek=s testimony would fall short of Aabsolute certainty.@  See Kramer, 858 S.W.2d at 405.  Only testimony of Areasonable probability@ is
required in cases such as this.  See
Milo, 909 S.W.2d at 511.  Given this Alower threshold of certainty,@ we believe that Dr. Marek=s use of the word Aprobably@ to qualify his opinion did not ipso facto
render his testimony incompetent or inadmissible, as the Hospital
contends.  See Kramer, 858 S.W.2d
at 405.  The Hospital=s first sub-issue is overruled.

2. 
Micrometastatic Disease Versus Macrometastatic Disease     

The second sub-issue raised by the Hospital is
premised on what appears to be an inaccurate interpretation of the record.  The Hospital contends that Dr. Marek=s estimate of reasonable and necessary medical
expenses was unreliable because it was based on an assumption that Dr. Marek=s own testimony later proved to be unfounded and
false.  We disagree.    








A review of the testimony reveals a critical
discrepancy between the Hospital=s representation of Dr. Marek=s testimony and what is actually documented in the
record.  Dr. Marek testified that Mrs.
Hawley would have probably incurred only one-third of her medical expenses if
she had begun treatment at the time of diagnosis, assuming she did not develop
macrometastatic disease requiring additional treatment.  

The parties disagree about whether Dr. Marek later
testified that Mrs. Hawley had already developed macrometastatic disease at the
time of diagnosis.  According to the
Hospital, Dr. Marek testified that, at the time of diagnosis, Mrs. Hawley Ahad [already] metastasized with certainty.@  Thus, in the
Hospital=s view, Dr. Marek=s
testimony established that Mrs. Hawley would have required additional treatment
and therefore would have incurred reasonable and necessary medical expenses in
excess of the one-third estimate previously posited by Dr. Marek.   

We disagree. 
Dr. Marek actually testified as follows: 
A[W]e just unfortunately can=t draw a whole lot [of conclusions] except to say,
with certainty, that she did have micrometastatic disease at the time of her
diagnosis.@  The Hospital=s interpretation of the record assumes that the Amicrometastatic disease@ mentioned in the preceding quote refers to and is
interchangeable with the Ametastatic disease@ that
Dr. Marek assumed Mrs. Hawley did not have at the time of her diagnosis. 








As discussed above, the uncontradicted evidence
adduced at trial established a significant distinction between micrometastatic
disease and metastatic or macrometastatic disease.  All the experts who testified at trial agreed
that, at the very least, Mrs. Hawley suffered from micrometastatic disease at
the time of her diagnosis.  Dr. Marek
testified to as much in the above quote. 
We do not interpret Dr. Marek=s testimony to mean that Mrs. Hawley=s condition was actually the more advanced condition
of metastatic or macrometastatic disease, as the Hospital suggests.  Dr. Marek=s
testimony is expressly qualified by the assumption that a new, clinically demonstrable
tumor had not developed in Mrs. Hawley=s liver at the time of her diagnosis and that she
therefore did not suffer from metastatic or macrometastatic disease.     

In evaluating a legal-sufficiency challenge, every
reasonable inference deducible from the evidence must be indulged in favor of
the prevailing party.  See City of
Keller v. Wilson, 168 S.W.3d 802, 827B28 (Tex. 2005); Formosa Plastics Corp. USA v.
Presidio Eng=rs & Contractors, Inc., 960 S.W.2d 41, 48 (Tex. 1998).  Under this standard, we conclude that there
is enough evidence in the record for reasonable and fair-minded people to reach
different conclusions as to the amount of reasonable and necessary medical
expenses incurred by Mrs. Hawley as a result of the Hospital=s negligence.  See Burroughs Wellcome Co. v. Crye, 907
S.W.2d 497, 499 (Tex. 1995).   The
Hospital=s legal-sufficiency challenge is therefore
overruled.  See Wal‑Mart Stores,
Inc. v. Canchola, 121 S.W.3d 735, 739 (Tex. 2003). 

In evaluating a factual-sufficiency challenge, this
Court must review the entire record in a neutral light and determine whether
the contested finding is so contrary to the great weight and preponderance of
the evidence as to be manifestly unjust, shock the conscience, or clearly
demonstrate bias. Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757,
761B62 (Tex. 2003) (factual sufficiency).  Applying this standard, we hold that the
evidence is factually sufficient to support the award of reasonable and
necessary medical expenses.

The Hospital=s eighth issue is overruled.        

II. Challenges to Evidentiary Rulings 








The Hospital=s first and second issues challenge the trial court=s admission and exclusion of certain expert
testimony.  The trial court has broad
discretion in this area.  Exxon
Pipeline Co. v. Zwahr, 88 S.W.3d 623, 629 (Tex. 2002).  For an expert=s
opinion testimony to be admissible, the expert must be qualified, the expert=s opinion must be relevant to the issues in the
case, and the expert=s opinion must be based upon a reliable foundation.  Id. at 628B29
(citing Tex. R. Evid. 702; Gammill
v. Jack Williams Chevrolet, Inc., 972 S.W.2d 713, 720 (Tex. 1998); E.I.
du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 556 (Tex.
1995)).  It is settled in Texas that a
trial court=s ruling on the admissibility of evidence will not
amount to reversible error unless the error probably led to the rendition of an
improper judgment.  Tex. R. App. P. 41.1(a); McCraw v.
Maris, 828 S.W.2d 756, 758 (Tex. 1992).  The supreme court has found it impossible to
prescribe a specific test for this determination, and it has therefore become a
judgment call entrusted to the sound discretion and good sense of the reviewing
court from an evaluation of the whole case.  Nix v. H.R. Mgmt. Co., 733 S.W.2d 573, 576
(Tex. App.CSan Antonio 1987, writ ref=d n.r.e.) (citing Lorusso v. Members Mutual Ins.
Co., 603 S.W.2d 818, 821 (Tex. 1980)); see also Ponder v. Texarkana Mem=l Hosp., Inc., 840 S.W.2d 476, 479 (Tex. App.CHouston [14th Dist.] 1991, writ denied).                  

A.  Admission of Testimony by Treating Physicians

In its first issue, the Hospital argues that the
trial court erred by admitting the testimony of Drs. Escudier and Marek. 

1. Testimony by Dr. Escudier

A video deposition of Dr. Escudier was played to the
jury at trial.   Dr. Escudier was one of
Mrs. Hawley=s treating physicians.  On appeal, the Hospital contends that Dr.
Escudier=s testimony was inadmissible for numerous
reasons.  








As a preliminary matter, the Hospital argues that,
even though Dr. Escudier was one of Mrs. Hawley=s
treating oncologists, she was not qualified as an expert in the field of colon
cancer treatment because she had no special training beyond medical
oncology.  See Tex. R. Evid. 702.  We find this criticism unfounded given
the following exchange:

Counsel for Hospital:        I see,
Doctor, that you=re a medical doctor, and you=re board certified in both oncology and hematology;
is that correct?

 

Dr. Escudier:                       Correct.

 

Counsel for Hospital:        Have
you been practicing as an oncologist your entire history as an MD?

 

Dr. Escudier:                       Yes.

 

Counsel for Hospital:        Do you
subspecialize in any kind of oncology?

 

Dr. Escudier:                       I do
everything.

 

Counsel for Hospital:        Do you
have any special interest in one type of cancer or tumor?

 

Dr. Escudier:                       I do
everything.  What I like the best is the
malignant hematology and breast cancer, but I - - and I do everything.

 

Counsel for Hospital:        Do you
have any specific training other than generalized oncology in treating colon
cancer or colon cancer with metastases?

 

Dr. Escudier:                       Nothing
beyond the medical oncology.

 

Counsel for Hospital:        Is
there any specific training available, or a fellowship in - - 

 

Dr. Escudier:                       No.

 

Counsel for Hospital:        Okay.                








In response to counsel=s
questioning, Dr. Escudier explained that, beyond a fellowship in medical
oncology, no specific training or fellowship is available in the field of colon
cancer or colon cancer with metastases. 
The Hospital has failed to direct this Court to any portion of the
record that contains evidence contradicting Dr. Escudier=s testimony, nor has this Court discovered any
evidence disproving her statements.  Dr.
Escudier also testified that she had completed a fellowship in medical oncology
and had spent much of her career treating patients with colon cancer.  We therefore find no merit in the Hospital=s criticism of Dr. Escudier=s qualifications to give expert testimony on the
subject of colon cancer treatment, including survival rates for patients whom
she routinely treats as an oncologist. 

 

We share the confusion expressed by counsel for the
Hawleys when he asked who could be more eminently qualified to give expert
opinion testimony based on professional and intimate knowledge of the
circumstances of this particular disease in this particular patient than a
triple board-certified oncologist who has provided much of the care undertaken
to cure and palliate the conditions afflicting Mrs. Hawley.  These are the very conditions which now form
the heated focus of contention in this case. 
Surely some preeminent practitioners and scholars fit the description,
but by no means is this Court a medical expert in its own right.  We rely on the parties and their counsel to
educate us in many matters, including the complexities and nuances of
negligence claims arising in the healthcare industry.     








In this case, the Hospital argues that Dr. Escudier,
a treating physician, was not qualified to testify, and yet, not once during
her deposition did counsel for the Hospital ever challenge Dr. Escudier=s qualifications. 
At one point, counsel asked if Dr. Escudier had any greater training or
education in the treatment of colon cancer than a fellowship in medical
oncology from M.D. Anderson, along with board certifications in internal
medicine, hematology, and oncology, and a daily practice of treating patients
with all forms of cancer, including a great number suffering from colon
cancer.  Dr. Escudier testified that no
such training is available.  The Hospital
never undertook to disprove Dr. Escudier=s testimony in this regard.  The Hospital=s
expert, though qualified in his own right as a board-certified oncologist, was
not so vastly accomplished in knowledge, training, or experience that this
Court can appreciate any meaningful reason why he, but not Dr. Escudier, should
be deemed qualified to testify as an expert on the subject of colon cancer
treatment and survival rates.  

We find it curious that counsel for the Hospital
lodged his objections to Dr. Escudier=s testimony after his own expert oncologist, Dr.
Raefsky, gave the following deposition testimony: 

Counsel for Hawley:         I know
you read [Dr. Escudier=s deposition] . . . , but do you agree with me that
she said Duke=s C, average five-year survival is 60 percent, and
she said that she felt that that would be applicable to her patient?

 

Do you know she testified to that?

 

Dr. Raefsky:                         I think in
this particular case that Mrs. Hawley=s prognosis was probably a little bit worse based on
the number of positive nodes.  But I
think, you know, to a reasonable guess, her prognosis is one that I=m willing to accept. 

 

Counsel for Hawley:         Whose
diagnosis, Dr. Escudier?

 

Dr. Raefsky:                         Correct.     

 








In his deposition, Dr. Raefsky went on to recognize
Dr. Escudier as Aa well-trained, well-qualified oncologist.@  

The record also shows some interesting, if not
ironic, inconsistencies in the qualifications the Hospital demanded of  Aexpert oncologists.@   Dr. Raefsky, the Hospital=s expert oncologist, gave the following testimony
about his training and qualifications to testify:

Counsel for Hawleys:       Do you
have any special training to give opinions on colon cancer specifically?

 

Dr. Raefsky:                         I
have training in the sense that colon cancer is a very common cancer and one of
the most common cancers that I treat. 
And therefore, I feel I have a lot of expertise about the management and
prognosis of patients with colon cancer. 
But I don=t specialize in colon cancers.           

 

These are virtually the same qualifications
possessed by Dr. Escudier, which the Hospital challenges in this appeal as
being inadequate.           

In a related sub-issue, the Hospital contends that
it was harmed by not having an opportunity to take Dr. Escudier on voir dire at
trial.  We disagree.  Counsel for the Hospital was afforded an
opportunity to examine Dr. Escudier during her deposition to discover the data
and facts underlying her testimony.  At
that time, if not sooner, counsel was also informed that Dr. Escudier would not
appear at trial and that a video recording of her deposition would be played to
the jury.  The Hospital was thus aware
that voir dire issues needed to be addressed during deposition, when counsel
was given an opportunity to examine Dr. Escudier and to challenge her
qualifications and any of the experience, knowledge, methodology, statistics,
or expertise upon which her testimony would be based. 








Instead of doing so, counsel repeatedly attempted to
solicit expert testimony from Dr. Escudier to establish that Mrs. Hawley=s cancer had progressed to Duke=s D by November 2000.  In fact, it was not until the trial commenced
that counsel for the Hospital first raised any complaint as to Dr. Escudier=s qualifications as an oncologist and first
expressed a desire to take her on voir dire to examine her credentials and the
medical bases for her testimony.  We will
not hold that the trial court erred solely because, in retrospect, counsel did
not examine a witness as thoroughly as he would have liked.








Finally, the Hospital contends that Dr. Escudier=s testimony should have been excluded because it was
confusing and speculative.  We have
reviewed the record, as well as the appellate briefs, and must note that one of
the most confusing aspects of this caseCaside from the highly technical nature of much of
the relevant testimonyCis the manner in which the Hospital=s brief represents the testimony given by Dr.
Escudier.  Dr. Escudier testified
unequivocally that no oncologist or pathologist could retrospectively determine
with absolute certainty the exact stage of Mrs. Hawley=s cancer in November 2000.  Dr. Escudier emphasized repeatedly that, in
her professional opinion, the exact stage of the cancer could not be known
because no liver imaging was performed and thus no overt evidence of
macrometastatic disease was discovered at the time of the initial
diagnosis.  Dr. Escudier testified that
the most any physician could say with reasonable certainty is that the cancer
was at least Duke=s C at the time of diagnosis. Upon further
questioning by counsel for the Hospital, Dr. Escudier acknowledged that,
without proper liver imaging and exploration, Duke=s D could not be ruled out with absolute certainty,
but she also emphasized that the clinical criteria for a Duke=s D diagnosis requires demonstrable evidence of a
new, measurable tumor.  According to Dr.
Escudier, such evidence was lacking in this case, and she therefore Awould just revert back to the usual Duke=s C prognosis.@ 

The Hospital criticizes Dr. Escudier for supposedly
basing her testimony on speculation.  We
disagree.  A complete reading of Dr.
Escudier=s testimony demonstrates that Dr. Escudier merely
acknowledged the limitations of medical science, and more specifically, those
of retrospective cancer staging in circumstances in which metastatic cancer is
untreated for an extended period. 
According to Dr. Escudier, in such circumstances, a reasonable diagnosis
can be made only on the objective evidence available to the diagnosing
physician.  Based on the objective
evidence in this case, Dr. Escudier concluded that Mrs. Hawley=s cancer had not advanced to Duke=s D in November 2000.  She based this opinion on her experience,
knowledge, and expertise, as well as her individual, professional evaluation
and treatment of Mrs. Hawley.  We do not
fault Dr. Escudier for having the professionalism to acknowledge that her
opinion could be incorrect and that the true stage of the cancer is unknowable
with absolute certainty because Mrs. Hawley=s
initial diagnosis was not acted on for nearly a year.  Nor do we find her testimony any less helpful
in assisting the trier of fact simply because it was qualified by the limited
data available.

We are confident that, in performing its
independent, gate-keeping function, the trial court considered these and many
other factors in arriving at its decision to admit Dr. Escudier=s testimony. 
Having no basis to overturn this decision, we overrule the Hospital=s first issue as it relates to the admissibility of
Dr. Escudier=s testimony.       

 2.  Testimony by Dr. Marek         








In its first issue, the Hospital also complains of
the trial court=s admission of deposition testimony by Dr. Marek, a
second board-certified oncologist who treated Mrs. Hawley, along with Dr.
Escudier.  The Hospital argues that Dr.
Marek should not have been allowed to testify as to Mrs. Hawley=s chances of survival in November 2000 because his
opinion was based on speculation, had no factual or scientific support, was
unreliable, and would not assist the jury, but would confuse them and cause
them to speculate as to what his opinion really meant.      

We have reviewed Dr. Marek=s testimony and find these criticisms
unfounded.  In a video deposition played
for the jury at trial, Dr. Marek testified that he had Ano doubt@ that Mrs. Hawley had micrometastatic spread of her
adenocarcinoma of the colon in November 2000. 
In Dr. Marek=s opinion, the spread would not have been measurable
by current radiographic means.  Dr. Marek
could not be absolutely certain of this because no imaging or scans had
actually been performed, but he maintained that, in his professional opinion,
the spread would not have been detectable or measurable in November 2000.  








Like Dr. Escudier, Dr. Marek explained that a
diagnosis beyond Duke=s C cannot be made without clinically demonstrable
proof of a new tumor that is measurable. 
He therefore concurred with Dr. Escudier=s
opinion that, based on the available data, Mrs. Hawley=s cancer could not be staged beyond Duke=s C as of November 2000.  Like Dr. Escudier and the Hospital=s expert oncologist, Dr. Raefsky, Dr. Marek
testified that the survival rate for a patient suffering from Duke=s C cancer was roughly 60 percent.  When asked by counsel for the Hospital what
Mrs. Hawley=s chances of survival would have been if treatment
had begun immediately upon diagnosis, Dr. Marek testified that, in his opinion,
she would have had a 65 percent chance of being cured.  Like Dr. Escudier, Dr. Marek acknowledged
that it was Apossible@ that the actual cure rate could be lower than 65
percent, but he defended his prognosis as consistent with the available data,
the clinical criteria for staging colon cancer, and the statistical studies for
patients who undergo treatment for colon cancer.  Like Dr. Escudier, Dr. Marek refused to
represent his professional judgment as infallible.         

On appeal, the Hospital contends that Dr. Marek=s opinion was based on speculation, lacked factual
and scientific support, and was therefore unreliable and inadmissable.  This is a surprising choice of appellate
issues, given that the Hospital=s counsel raised no such concerns during Dr. Marek=s deposition. 
After discussing with Dr. Marek the relevant statistics published in the
2002 American Society of Clinical Oncology Educational Book, the update on
adjuvant chemotherapy and morbidity, the seventh edition of Devita, Principles
and Practice of Oncology, the Cohen studies, a treatise by Eisenberg, and the
Mortel article from the Mayo Clinic, counsel for the Hospital said, AI think Dr. Raefsky, when he was being deposed in
this matter, agreed with all your statistics. 
I mean, he, basically said the same thing.@  Indeed, having reviewed the record, we find
that the statistics relied upon bv Dr. Marek for the different stages of colon
cancer and survival rates were generally agreed upon by all the experts who
testified at trial, whether they were pathologists or oncologists, and
regardless of which party had hired the expert.   There was also virtually no disagreement as
to the criteria for staging colon cancer. 








Given the substantial similarity between the
probative value of the testimony by Dr. Marek and that of Dr. Escudier, we
believe that any error in the trial court=s admission of Dr. Marek=s testimony would not amount to error that probably
led to the rendition of an improper judgment. 
See Tex. R. App. P.
41.1(a); McCraw, 828 S.W.2d at 758. 
In fact, Dr. Marek=s testimony largely duplicated testimony from Dr.
Escudier that we have already held to be admissible.  No error has been demonstrated.  

To the extent that Dr. Marek=s testimony is criticized for being confusing, we
agree with the sentiment expressed by the trial court in the following
exchange:

Counsel for Hospital:        Dr.
Marek in his deposition also discusses different statistics and goes back on
them.  In particular he=s unclear, he speculates, he agrees with my expert
and then says, you know, maybe, maybe not . . . . 

 

The Court:                            That=s because you do such a good job
cross-examining.   

We have reviewed the record and find that Dr. Marek=s testimony is reasonably comprehensible and helpful
to resolve an issue of fact central to the case.  Our review of the record also shows that the
Hospital presented evidence that conflicted with Dr. Marek=s testimony. 
Conflicts in evidence do not necessarily render evidence inadmissible.  After all, it is the jury=s role to resolve conflicts in the evidence, a
function which assumes the evidence on critical issues will be mixed.  And, of course, agreeing with expert opinion
testimony is something quite different than understanding it.  








We appreciate counsel=s role
as an advocate for the Hospital and applaud his efforts to advance the Hospital=s case by rigorously cross-examining Dr. Marek.  Counsel=s cross-examination developed the differences
between the professional opinions of Dr. Marek and Dr. Escudier and those of
Dr. Raefsky.  These board-certified
oncologists, who have active practices treating patients with colon cancer,
disagreed about whether Mrs. Hawley had Duke=s C or
Duke=s D colon cancer in November 2000.  It seems natural and understandable that a
disagreement of this nature in medical opinions among such highly qualified
physicians will cause at least some confusion to lay observers.  Dr. Marek can hardly be blamed for creating
this inconvenience.  

The problem is no doubt exacerbated at trial by the
adversarial nature of how testimony is presented to the trier of fact through
examination and cross-examination of witnesses. 
For these reasons, among others, the trial court must determine whether
the probative value of the testimony is outweighed by the danger that the
issues will be confused or the jury will be misled, or whether the expert=s testimony will assist the trier of fact to
understand the evidence or to determine a fact in issue.  See Tex.
R. Evid. 403, 702.  We believe
that, in this case, the trial court did not abuse its discretion in determining
that Dr. Marek=s testimony should be admitted.  The Hospital=s first
issue is overruled.

B. Exclusion of Expert Opinion Testimony of Treating
Physicians= Negligence   









In its second issue, the Hospital argues that the
trial court committed reversible error by excluding certain testimony regarding
the negligence of Drs. Arechiga and Rodriguez, Mrs. Hawley=s internist and surgeon.  This evidence was offered to prove that the
negligence of Mrs. Hawley=s physicians was a new and independent cause of her
injuries.             Before trial, the Hawleys objected to the Hospital=s amended answer, in which the Hospital asserted the
defense of new and independent cause for the first time six days prior to
trial.  The Hawleys asked the trial court
to strike the pleading.  The Hawleys also
filed a motion in limine regarding any evidence that Mrs. Hawley=s treating physicians were negligent in rendering
treatment.  The motion in limine has
not been made part of the clerk=s record in this appeal, but the reporter=s record shows that the trial court granted the
motion, at least in part.  The trial
court ruled that the Hospital could put on testimony and other evidence of what
Mrs. Hawley=s treating physicians should have done under the
circumstances, but the court specifically cautioned counsel not to tie the
conduct of the treating physicians to the word Anegligence.@

At trial, the Hospital offered evidence to prove
that Drs. Arechiga and Rodriguez were negligent.  This evidence was excluded, and the Hospital
was allowed to make appropriate offers of proof.  On appeal, the Hospital contends that the
exclusion of this evidence amounts to reversible error because it was the only
evidence of new and independent cause.  








New and independent cause, also known as superseding
cause, is an inferential rebuttal defense that may be submitted to the jury as
an instruction but not as a special issue. 
J. Wigglesworth Co. v. Peeples, 985 S.W.2d 659, 665 (Tex. App.CFort Worth 1999, pet. denied) (citing Tex. R. Civ. P. 277; Perez v.
Weingarten Realty Investors, 881 S.W.2d 490, 496 (Tex. App.CSan Antonio 1994, writ denied)).  A new and independent cause is some act or
omission of a separate and independent agency that destroys the causal
connection between the defendant=s original negligent act and the occurrence in
question.  Id. (citing Young v.
Massey, 101 S.W.2d 809, 810 (1937)). 
If an intervening cause was reasonably foreseeable by the defendant in
the exercise of ordinary care, it cannot be considered a new and independent
cause that will break the chain of causation. 
Id.  (citing Knoll v.
Neblett, 966 S.W.2d 622, 634 (Tex. App.CHouston
[14th Dist.] 1998, writ denied); Hall v. Huff, 957 S.W.2d 90, 98 (Tex.
App.CTexarkana 1997, writ denied)).  The issue of an Aintervening cause@ as a
bar to a defendant=s liability is also dependent on whether the
defendant=s negligence and the forces generated by that
negligence have come to a rest.  Id. (citing
Henry v. Houston Lighting & Power Co., 934 S.W.2d 748, 754 (Tex.
App.CHouston [1st Dist.] 1996, writ denied)).

The following factors taken from the Restatement (Second) of Torts ' 442 (1965) may be considered in determining whether
an intervening force rises to the level of a new and independent or superseding
cause:  (1) the fact that the intervening
force brings about harm different in kind from that which would otherwise have
resulted from the actor=s negligence; (2) the fact that the intervening
force=s operation or the consequences thereof appear after
the event to be extraordinary rather than normal in view of the circumstances
existing at the time of the force=s operation; (3) the fact that the intervening force
is operating independently of any situation created by the actor=s negligence, or, on the other hand, is or is not a
normal result of such a situation; (4) the fact that the operation of the
intervening force is due to a third person=s act or to his failure to act; (5) the fact that
the intervening force is due to a third person=s act
that is wrongful toward the other and as such subjects the third person to
liability to him; and (6) the degree of culpability of the third person=s wrongful act that sets the intervening force in
motion.  See Phan Son Van v. Pena,
990 S.W.2d 751, 754 (Tex. 1999) (citing Travis v. City of Mesquite, 830
S.W.2d 94, 98 (Tex. 1992)); Morris v. JTM Materials, Inc., 78 S.W.3d 28,
54 (Tex. App.CFort Worth 2002, no pet.).              








The Hospital has not raised any appellate issue
regarding the sufficiency of the evidence to prove that it breached a duty owed
to Mrs. Hawley (i.e., that its conduct fell below the standard of care that
would be exercised by a hospital of ordinary prudence under the same or similar
circumstances).  See Denton Reg=l Med. Ctr. v. LaCroix, 947 S.W.2d 941, 950 (Tex. App.CFort Worth 1997, pet. denied); Hilzendager v.
Methodist Hosp., 596 S.W.2d 284, 286 (Tex. Civ. App.CHouston [1st Dist.] 1980, no writ).  The Hospital has only challenged the
sufficiency of the evidence regarding causation.  As discussed above, this particular challenge
is limited to the issue of whether Mrs. Hawley=s
chances of survival were greater than 50 percent in November 2000, when the
Hospital was allegedly negligent.  The
sole contention advanced by the Hospital is that Mrs. Hawley=s chances were less than 50 percent and thus she and
her husband are barred from recovering damages under the loss-of-chance
rule.  See Milo, 909 S.W.2d at
511; Kramer, 858 S.W.2d at 400. 
Given the Hospital=s choice of appellate issues, we have no basis for
reviewing or rejecting the jury=s finding that the Hospital=s performance fell below the applicable standard of
care owed to Mrs. Hawley.  See Tex. R. App. P. 47.1. 

To establish the inferential rebuttal defense of new
and independent cause, the Hospital had to produce evidence that its negligence
and the forces generated by its negligence had come to a rest at the time the
physicians were allegedly negligent.  Henry
v. Houston Lighting & Power Co., 934 S.W.2d 748, 754 (Tex. App.CHouston [1st Dist.] 1996, writ denied).  That is, a new and independent cause does not
exist if the chain of causation flowing from the defendant=s original negligence is continuous and
unbroken.  Biaggi v. Patrizio Rest.,
Inc., 149 S.W.3d 300, 309 (Tex. App.CDallas 2004, pet. filed); Brownsville Med. Ctr.
v. Gracia, 704 S.W.2d 68, 73 (Tex. App.CCorpus
Christi 1985, writ ref=d n.r.e.).








The evidence adduced by the Hospital in support of
its defense of new and independent cause was limited to testimony to the effect
that it was unforeseeable that the treating physicians would not follow up on
the results of the pathology tests and discover the report showing that Mrs.
Hawley had colon cancer.  The Hospital
offered proof that the physicians were negligent in this regard; however, the
negligence of a third party does not necessarily create a new and independent
cause.  The courts of this state have
long distinguished between new and independent causes, which destroy the causal
chain, freeing a defendant of liability, and concurring causes, which simply
work in concert with forces generated by the defendant=s negligence and do not relieve a defendant of
liability.  Phoenix Refining Co. v.
Tips, 81 S.W.2d 60, 61 (Tex. 1935) (A[N]ew and independent cause . . . means >the act or omission of a separate and independent
agency, which destroys the casual connection between the negligent act or
omission of the defendant and the injury complained of, and thereby becomes, in
itself, the immediate cause of such injury.=@) (internal citations omitted); see also Bell v.
Campbell, 434 S.W.2d 117, 122 (Tex. 1968) (AWhen
the new cause or agency concurs with the continuing and cooperating original
negligence in working the injury, the original negligence remains a proximate
cause of the injury, and the fact that the new concurring cause or agency may
not in such case have been reasonably foreseeable should not relieve the
wrongdoer of liability.@). 








In this case, the Hospital=s offers of proof support nothing more than a
finding of a concurring cause.  There is
no evidence that the forces created and the harm inflicted by the physicians= alleged negligence were different in any respect
from the forces put into motion by the Hospital=s
negligence or the harm caused by the Hospital. The causal connection in this
case is quite straightforward:  the
Hospital=s negligence led to an 11-month delay in notifying
Mrs. Hawley that she had cancer.  This
delay allowed the cancer to go untreated, and every medical doctor who
testified at trial agreed that the cancer became much worse during this
11-month period.  Mrs. Hawley ultimately
died of complications arising from her cancer, but she lived long enough to sue
the Hospital.   

The evidence offered by the Hospital and excluded by
the trial court tended to prove that the delay in notifying Mrs. Hawley can
also be attributed to the treating physicians, who should have reviewed her
charts and discovered the diagnosis. 
Although this certainly seems fair, the Hospital still had the burden of
proving that the effects of its negligence were cut off by the doctors= alleged negligence or had otherwise ceased by the
time of the doctors= negligence. 
The evidence offered by the Hospital did not accomplish this.  Instead, the evidence showed that the Hospital
was negligent in failing to implement and follow policies and practices that
would prevent such delays.  The evidence
also tended to prove that the causal forces set in motion by the doctors and
the Hospital were intertwined in a single communication failure that caused
Mrs. Hawley=s injuries. 
The causal chain in this communication failure was continuous and
unbroken, though it is obvious that many forces were at play.  

The admissibility of evidence is a discretionary
issue for the trial court.  City of
Brownsville v. Alvarado, 897 S.W.2d 750, 753B54
(Tex. 1995).  Thus, to prevail on this
issue, the Hospital had to establish that no basis in law exists to support the
trial court=s exclusion of the evidence.  See id.  The Hospital has not carried this burden.  The Hospital=s
second issue is therefore overruled.

III. 
Challenges Related to the Jury Charge    








Three of the Hospital=s
issues relate to the trial court=s refusal to give requested jury instructions.  A trial court must submit Asuch instructions and definitions as shall be proper
to enable the jury to render a verdict.@  Tex. R. Civ. P. 277.  The court must submit the questions,
instructions, and definitions that are raised by the written pleadings and the
evidence.  Tex. R. Civ. P. 278. 
An instruction is proper if it (1) assists the jury, (2) accurately
states the law, and (3) finds support in the pleadings and evidence.  Tex. Workers= Comp. Ins. Fund v. Mandlbauer, 34 S.W.3d 909, 912 (Tex.  2000). 
If a trial court refuses to submit a requested instruction, the question
on appeal is whether the requested instruction was reasonably necessary to
enable the jury to render a proper verdict. 
Id.  The trial court has Aconsiderable discretion to determine necessary and
proper jury instructions.@  Id. at
911; Louisiana‑Pacific Corp. v. Knighten, 976 S.W.2d 674, 676 (Tex.
1998); State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451 (1997).  Consequently, reversal will not lie because
an instruction was refused unless a clear abuse of discretion is shown.  Butler v. De La Cruz, 812 S.W.2d 422,
426 (Tex. App.CSan Antonio 1991, writ denied). 

A.  New and
Independent Cause 

In its third issue, the Hospital contends that the
trial court erred in failing to instruct the jury regarding the law of new and
independent cause.  If the evidence in a negligence
case raises the issue of new and independent cause, it is error not to include
the term in the definition of proximate cause and to define it.  Wigglesworth, 985 S.W.2d at 665
(citing Massey, 101 S.W.2d at 810). 
The question of whether the trial court erred in refusing to give the
definition turns on whether the evidence in the record raised the issue of new
and independent cause.  Id.  We have reviewed the record and find no basis
for submitting this instruction.  








The Hospital argues that the pleadings, as well as
the testimony of Dr. Tucker, supported a jury instruction on new and
independent cause.  The Hospital
summarizes the relevant testimony as follows: 
ADr. Tucker testified it was unforeseeable that
during treatment of Mrs. Hawley subsequent to November 2000 and prior to
October 2001, neither Dr. Arechiga nor Dr. Rodriguez would have followed up on
the pathology report.@  The
essential contention advanced by the Hospital is that an instruction on new and
independent cause was required because the Hospital=s alleged negligence was cut off by the
unforeseeable failures of Drs. Arechiga and Rodriguez to independently discover
the pathology report and commence appropriate treatment of Mrs. Hawley=s cancer. 

We disagree. 
Unforeseeability is necessary, but not sufficient, for a finding of new
and independent cause.  Intervention of
an unforeseen cause of a plaintiff=s injury does not necessarily mean that there is a
new and independent cause of such a character as to constitute a superseding
cause which will relieve the defendant of liability.  Henry, 934 S.W.2d at 753 (citing Bell
v. Campbell, 434 S.W.2d 117, 121 (Tex. 1968); Teer v. J. Weingarten,
Inc., 426 S.W.2d 610, 614 (Tex. Civ. App.CHouston
[14th Dist.] 1968, writ ref=d n.r.e.)). 
The intervening cause of the plaintiff=s
injury, even if unforeseeable, may be a mere concurring cause if the chain of
causation flowing from the defendant=s original negligence is continuous and
unbroken.  Id. (citing Bell,
434 S.W.2d at 121.). That is the case here. 








Although Dr. Tucker testified that Drs. Arechiga and
Rodriguez should have followed up on the pathology report, Dr. Tucker=s testimony did not tend to establish that the
Hospital=s negligence had been cut off by the doctors= failures to act. 
Dr. Tucker never acknowledged that the Hospital had been negligent, much
less that its negligence had been superseded by something else.  At best, Dr. Tucker suggested that multiple
factors played into the communication failure that caused the notification
delay that led to Mrs. Hawley=s injuries. 
To the extent Dr. Tucker implicated Drs. Arechiga and Rodriguez in the
delay, his testimony was vague and speculative on the issue of causation,
suggesting only that the doctors= failures to follow up on the report were
unforeseeable and arguably contributed to the notification and treatment
delays.  Dr. Tucker did not testify that
the doctors actually caused the notification delay or that the delay was more
attributable to the doctors than to the negligence of the Hospital.  Dr. Tucker also did not testify that the harm
caused by the conduct of Drs. Arechiga and Rodriguez was different in any way
from harm caused by the Hospital=s negligence.  
Dr. Tucker=s testimony tended to prove nothing more than the
unforeseeability of the doctors= failures to act. 
There was no evidence that the forces created by the Hospital=s alleged negligence had come to rest.  Nor was there any evidence that the causal
connection between the Hospital=s alleged negligence and Mrs. Hawley=s injuries had been destroyed by an act or omission
of a third party that became the immediate cause of Mrs. Hawley=s injuries. 
Equally remarkable is the failure of the evidence to militate in any
meaningful respect toward a finding of new and independent cause under the
factors endorsed by the supreme court in Phan Son Van.  See Phan Son Van, 990 S.W.2d at
754.  There was therefore no basis for
submitting a jury instruction on new and independent cause.  Accordingly, we conclude that the trial court
did not abuse its discretion.  The
Hospital=s third issue is overruled.    

B.  Loss of
Chance 








In its fourth issue, the Hospital contends that the trial
court erred in refusing to give the jury an instruction that Mrs. Hawley must
have had a greater than 50 percent chance of survival on November 28, 2000 for
the Hospital=s negligence to be a proximate cause of her
injuries.  We agree with the Hospital=s understanding of the loss-of-chance rule, but for
the reasons stated below, we conclude that the trial court did not commit an
abuse of discretion that would warrant reversal.  

The supreme court has spoken with great clarity on
the loss-of-chance rule, leaving no room for disagreement:  recovery in a medical malpractice case cannot
be had if, at the time of the alleged negligence, the patient had a pre‑existing
condition from which the chance of survival was 50 percent or less.  See Milo, 909 S.W.2d at 511; Kramer,
858 S.W.2d at 400.  There being some
evidence that Mrs. Hawley=s chances of survival were less than 50  percent before the Hospital=s alleged negligence, we must decide whether the
trial court abused its discretion in refusing to give the jury a loss-of-chance
instruction.  See Mandlbauer, 34
S.W.3d at 912; Butler, 812 S.W.2d at 426.

The requested instruction accurately states the law
and finds support in the pleadings and evidence.  Nevertheless, the trial court could have
correctly refused the instruction if it would not have assisted the jury.  See Mandlbauer, 34 S.W.3d at 912.  The supreme court has often recognized the
trial court=s Aconsiderable discretion to determine necessary and
proper jury instructions.@  Id. at
911; Knighten, 976 S.W.2d at 676; Nicolau, 951 S.W.2d at
451.  Indeed, the trial court has much
more discretion in submitting instructions and definitions than in submitting
questions.  Harris v. Harris, 765
S.W.2d 798, 801 (Tex. App.CHouston [14th Dist.] 1989, writ denied) (op. on reh=g); see also Ishin Speed Sport v. Rutherford,
933 S.W.2d 343, 350 (Tex. App.CFort Worth 1996, no writ); Grenier v. Joe Camp,
Inc., 900 S.W.2d 848, 850 (Tex. App.CCorpus Christi 1995, no writ). 








The Hospital has failed to produce any precedent
from a Texas court endorsing a loss-of-chance instruction, much less any
precedent holding that a trial court abuses its discretion in refusing to give
such an instruction.  This Court=s independent research has also failed to yield any
guiding precedent.  The volume of the
Texas Pattern Jury Charges on medical malpractice cases offers no guidance on
loss-of-chance instructions, nor is any help offered in the volume on general
negligence.  See Comm. on Pattern Jury Charges, State Bar of
Tex., Tex. Pattern Jury Charges: Malpractice, Premises, & Products (2003);
Tex. Pattern Jury Charges: General
Negligence & Intentional Personal Torts (2003).  We are unaware of any documented practice of
instructing Texas juries on the loss-of-chance rule.  This is not to say that the practice should
be disparaged or discouraged or that it does not occur.  Such instructions may be commonplace and have
yet escaped documentation for myriad procedural and strategic factors that so
often characterize modern trial and appellate practices.    

The question we must answer is not whether the
loss-of-chance instruction should be rejected or endorsed.  We must decide only whether the trial court
abused its discretion in failing to include it in the jury charge in this
case.  The answer, in our opinion, rings
clear from the absence of guiding precedent. 
We are loathe to hold that the trial court reached a decision so
arbitrary and unreasonable as to amount to a clear and prejudicial error of law
if no assistance was available to guide the trial court to the proper
result.  See In re Cerberus Capital
Mgmt., L.P., 164 S.W.3d 379, 382 (Tex. 2005).  Nor can we fairly conclude that the trial
court clearly failed to correctly analyze or apply the law if no appellate
court in the state has set precedent requiring or even endorsing such an
instruction.  See id.           








Admittedly, this Court would be remiss if it were to
ignore the significance of the excluded instruction.  We recognize its value to the Hospital.  We also recognize the Hospital=s chief complaint, which is that, without the
instruction, the jury might have returned a verdict of liability based solely
on a lost chance of survival of 50 percent or less.  We disagree with this assertion.  As discussed above, legally-sufficient
evidence was adduced at trial to prove that Mrs. Hawley=s lost chance of survival was greater than 50
percent.  This case is thus different
than Kramer, where the plaintiff sought recovery for a diminished chance
of survival of less than 50 percent.  It
is also different than Milo, where the uncontroverted evidence showed
that the patient=s chance of survival was only 40 percent before the
defendant=s alleged negligence.   See Milo, 909 S.W.2d at 511; Kramer,
858 S.W.2d at 399. 








We also believe that no abuse of discretion occurred
because the loss-of-chance instruction was inherent in the jury charge.  In both Kramer and Milo, the
Texas Supreme Court stated that Athe ultimate standard of proof on the causation
issue is whether, by a preponderance of the evidence, the negligent act or
omission is shown to be a substantial factor in bringing about the harm and
without which the harm would not have occurred.@  Milo, 909 S.W.2d at 511; Kramer,
858 S.W.2d at 400.  In each opinion, the
supreme court explained that the loss-of-chance rule did not present a new
hurdle for plaintiffs but was merely a necessary implication of the ultimate
standard of proof.  See Milo, 909
S.W.2d at 511; Kramer, 858 S.W.2d at 400.  The jury charge in this case was entirely
consistent with the ultimate standard of proof.[4]  Because the loss-of-chance rule necessarily
follows from the ultimate standard of proof, there is no basis for concluding
that a loss-of-chance instruction was reasonably necessary to enable the jury
to render a proper verdict.  See
Mandlbauer, 34 S.W.3d at 912. 
Accordingly, there was no abuse of discretion, and even if there were an
abuse of discretion, we would not be able to conclude that it probably led to
the rendition of an improper judgment.  See
Tex. R. App. P. 44.1(a).  The Hospital=s
fourth issue is overruled. 

C.  Conduct of
Dr. Valencia

In its fifth issue, the Hospital contends that it is
entitled to a new trial based on the trial court=s
failure to instruct the jury not to consider the conduct of Dr. Valencia, an
independent contractor physician, when considering whether the negligence of
the Hospital proximately caused Mrs. Hawley=s
injuries.  According to the Hospital, AThe error is harmful because this Court cannot
determine whether the jury found liability in Question One based on the conduct
of Dr. Valencia, an invalid legal theory, or the conduct of Appellant.@  








Question One asked whether the Hospital=s negligence caused Mrs. Hawley=s injuries. 
The jury was instructed that A[n]egligence, when used with respect to the conduct
of . . . the Hospital, means failure to use ordinary care, that is, failing to
do that which a hospital of ordinary prudence would have done under the same or
similar circumstances, or doing that which a hospital of ordinary prudence
would not have done under the same or similar circumstances.@  The charge
further instructed that the Hospital Aacts or fails to act only through its employees,
agents, nurses, and servants.@  

We cannot conclude that the exclusion of the
requested instruction probably led to the rendition of an improper judgment or
probably prevented the Hospital from properly presenting the case on
appeal.  See Tex. R. App. P. 44.1(a).  The charge authorized a finding of liability
based only on the Hospital=s negligence. 
The jury was instructed that the Hospital could be negligent, that the
Hospital acts or fails to act, only through its employees, agents, nurses, and
servants.  There being no evidence that
Dr. Valencia was an employee, agent, nurse, or servant of the Hospital, the
charge did not authorize the jury to reach a finding of negligence based on Dr.
Valencia=s conduct. 
The Hospital=s fifth issue is overruled. 

IV.  Damages
and Interest

A. 
Segregation of Damages Caused by Pre-Existing Condition 








In its seventh issue, the Hospital argues that it is
entitled to a new trial based on the Hawleys=
failure to segregate the damages caused by the Hospital from those damages
caused by Mrs. Hawley=s pre-existing condition.  We disagree. 
The damages were sufficiently segregated between the reasonable and
necessary medical expenses resulting from Mrs. Hawley=s pre-existing medical condition and those caused by
the Hospital.  As demonstrated above, the
evidence and testimony plainly distinguished between Mrs. Hawley=s total medical expenses and those that were
proximately caused by the Hospital=s negligence. 
The jury was specifically instructed Anot
[to] include [in its award] any amount for any condition of Alice M. Hawley
existing before November 28, 2000,@ the time of the Hospital=s negligence. 

The Hospital=s brief is unclear as to whether its seventh issue
raises a challenge to the sufficiency of the evidence or a jury-charge
error.  Out of an abundance of caution,
we address the issue as both types of challenges.     

Viewed in the light most favorable to the verdict,
there was more than a scintilla of evidence to distinguish between the
reasonable and necessary medical expenses resulting from Mrs. Hawley=s pre-existing medical condition and those caused by
the Hospital.  See Formosa, 960
S.W.2d at 48. There is thus no basis for sustaining a legal-sufficiency
challenge regarding segregation of damages. 

Viewing the entire record in a neutral light, there
is no basis for concluding that the contested finding is so contrary to the
great weight and preponderance of the evidence as to be manifestly unjust,
shock the conscience, or clearly demonstrate bias.  See Golden Eagle, 116 S.W.3d at 761B62.  There is
thus no basis for sustaining a factual sufficiency challenge regarding
segregation of damages.  

We also recognize that this issue appears to raise a
jury-charge error predicated on the trial court=s
refusal to give an instruction requested by the Hospital.  To the extent the Hospital seeks to raise
this challenge, it has failed to adequately brief its contention, as it has
provided no argument or authority to establish that the instruction actually
given to the jury was erroneous or that the omission of the requested
instruction probably led to the rendition of an improper judgment.  See Tex.
R. App. P. 38.1(h); 44.1(a). 








The Hospital=s seventh issue is therefore overruled. 

B.  Damage Cap

In its ninth issue, the Hospital contends that the
judgment must be modified because the damages and associated prejudgment
interest should have been limited pursuant to the provisions of section 11.02
of former Article 4590i of the Texas Revised Civil Statutes.  Tex.
Rev. Civ. Stat. Ann. art. 4590i, ' 11.02.  The
Hawleys contend that any application of the damage caps in this case would be a
clear violation of the Open Courts Provision of the Texas Constitution.  See Tex.
Const. art I, ' 13.  The Hospital
concedes that the damage caps under former Article 4590i have been held
unconstitutional by the Texas Supreme Court, but it argues that the caps have
never been held to be unenforceable under the state legislature=s broad police powers.  See Lucas v. United States, 757 S.W.2d
687, 692 (Tex. 1988) (AIt is simply unfair and unreasonable to impose the
burden of supporting the medical care industry solely upon those persons who
are most severely injured and therefore most in need of compensation.@) (citations omitted).     

The Hawleys= claim against the Hospital is for common law
negligence, not for wrongful death under the survival statute.  In Horizon/CMS Healthcare Corp. v. Auld,
34 S.W.3d 887, 901B02 (Tex. 2000), the Texas Supreme Court reaffirmed
that the damage caps in former Article 4590i are unconstitutional as applied to
common-law claims.  In this case, the
trial court refused to apply the caps, even though the Hospital requested their
application both before and after trial. 
We find no error in its refusal to do so.  Accordingly, the Hospital=s ninth issue is overruled.  

         








C.  Interest
Rates

In its tenth issue, the Hospital argues that the
judgment must be modified to decrease the pre- and post-judgment interest rates
from ten percent to five percent. 
Essentially, the Hospital argues that the trial court awarded excessive
interest because the provisions of House Bills 4 and 2415 govern the interest
rate applicable to the judgment in this case.[5]  We disagree.  









House Bills 4 and 2415 amended section 304.003(c) of
the finance code, reducing the effective post-judgment interest rate from ten
to five percent.[6]  The bills also changed the pre-judgment
interest rate, which is equal to the post-judgment interest rate applicable at
the time of the judgment.  Tex. Fin. Code Ann. ' 304.103 (Vernon Supp. 2004B05).  The
revisions of each bill apply to cases in which Aa
final judgment is signed or is subject to appeal on or after the effective date@ of the act.[7]   The provisions therefore apply if the
judgment in this case was signed on or after the effective date of either act,
or if the judgment became subject to appeal, that is, capable of being
appealed, on or after the effective date of the act.  SunBridge Healthcare Corp. v. Penny,
160 S.W.3d 230, 255 (Tex. App.CTexarkana 2005, no pet.).[8]  To determine the applicability of the bills,
we must first determine (1) the date each bill became effective, (2) the date
the judgment was signed, and (3) the date the judgment became appealable. 

House Bill 4 became effective on September 1,
2003.  The judgment in this case was
signed on March 27, 2003 and became appealable on that date.  See, e.g., Tesfa v. Stewart,
135 S.W.3d 272, 279 (Tex. App.CFort Worth 2004, pet. denied) (holding that a final
judgment can be appealed after it is signed by the judge).  Because the judgment was not signed on or
after the effective date of House Bill 4 and because it did not become subject
to appeal on or after that date, House Bill 4 does not apply in this case.  See Penny, 160 S.W.3d at 255.

On June 1, 2003, the legislature passed House Bill
2415 by more than a two-thirds majority vote of each house.  Again, the judgment in this case was signed
on March 27, 2003 and therefore did not become appealable on or after the
effective date of House Bill 2415.  There
is no basis for applying House Bill 2415. 
Accordingly, the Hospital=s tenth issue is overruled.   

V.  Conclusion

All issues raised by the Hospital are overruled and
the judgment of the trial court is affirmed. 

 

_______________________

DORI CONTRERAS GARZA,

Justice

 

Dissenting Opinion by

Justice Errlinda Castillo.

 

Opinion delivered and filed this 

the 23rd day of March, 2006.                                       











[1] As presented in appellant=s brief, the ten issues on appeal are the following:   

 

(1) the trial court=s erroneous admission of the
testimony of Dr. Susan Escudier and Dr. Billie Marek constituted harmful error
probably resulting in the rendition of an improper judgment; 

 

(2) the trial court=s erroneous exclusion of the
testimony of new and independent cause evidence constituted harmful error
probably resulting in the rendition of an improper judgment;

 

 (3) appellant is entitled to a new trial based
on the trial court=s failure to instruct the jury on Anew and independent@ cause; 

 

(4) appellant is entitled to a new
trial based on charge error due to the trial court=s failure to instruct the jury that
Mrs. Hawley must have had a greater than 50% chance of survival on November 28,
2000 for appellant=s negligence to be a proximate cause
of her injuries; 

 

(5) appellant is entitled to a new
trial based on the trial court=s failure to instruct the jury not
to consider the conduct of Dr. Valencia, an independent contractor physician,
when considering whether the negligence of appellant proximately caused Mrs.
Hawley=s injuries; 

 

(6) appellant is entitled to the
rendition of judgment in its favor based on the legal insufficiency of the
evidence to support the jury=s finding to Question One; 

 

(7) appellant is entitled to a new
trial based on appellees= failure to segregate the damages
allegedly caused by appellant from those damages caused by Mrs. Hawley=s pre-existing condition; 

 

(8) appellant is entitled to
rendition of judgment or, in the alternative, a new trial because there is
insufficient evidence to establish the reasonableness and necessity of the
medical expenses awarded by the jury and modified by the trial court; 

 

(9) the judgment must be modified
because the damages and associated prejudgment interest should have been
limited pursuant to the provisions of section 11.02 of former Article 4590i of
the Texas Revised Civil Statutes; and 

 

(10) the judgment must be modified to decrease pre-
and post-judgment interest rates from ten to five percent.





[2] See City of Keller v. Wilson,
168 S.W.3d 802, 827B28 (Tex. 2005) (legal sufficiency); Golden
Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761B62 (Tex. 2003) (factual
sufficiency). 





[3] In this appeal, the Hospital
contends that, for various reasons, certain testimony given by Mrs. Hawley=s treating physicians was
inadmissible.  The Hospital contends that
the trial court committed reversible error by allowing the jury to hear the
challenged testimony.  In Section II of
this opinion, we provide a discussion of these complaints and why we find them
to have no merit.  





[4] Question One asked the jury the following question:  AWas the negligence, if any, of . . . the Hospital a
proximate cause of injuries to Alice H. Hawley?@  
The following definition of Aproximate cause@ was given to the jury and mirrors the definition stated in
the Texas Pattern Jury Charges:

 

AProximate Cause,@ when used with respect to the
conduct of the Hospital, means that cause which, in a natural and continuous
sequence, produces an event, and without which cause such event would not have
occurred.  In order to be a proximate
cause, the act or omission complained of must be such that a hospital using
ordinary care would have foreseen that the event, or some similar event, might
reasonably result therefrom.  There may
be more than one proximate cause of any event.

 

See Comm. on
Pattern Jury Charges, State Bar of Tex., Tex. Pattern Jury Charges:
Malpractice, Premises, & Products 50.2 (2003).  The
charge also instructed the jury on the degree of certainty required for its
findings:

 

A Ayes@ answer must be based on a
preponderance of the evidence unless otherwise instructed.  If  you
do not find that a preponderance of the evidence supports a Ayes@ answer, then answer Ano.@ 
The term Apreponderance of the evidence@ means the greater weight and degree
of credible evidence admitted in this case. 
Whenever a question requires other than a Ayes@ or Ano@ answer, your answer must be based
on a preponderance of the evidence unless otherwise instructed.

 

This instruction was also taken from
the Texas Pattern Jury Charges.  See
id. at 40.3.





[5] 
See Act of June 2, 2003, 78th Leg.,
R.S., H.B. 4, ' 6.01 (House Bill 4); Act of June 2,
2003, 78th Leg., R.S., ch. 676, ' 1 (House Bill 2415).





[6] 
Although House Bills 4 and 2415 are different acts, they contain almost
identical revisions to the post-judgment interest provisions of the finance
code.  In this regard, they differ only
in that House Bill 4 contains a provision prohibiting pre-judgment interest on
future damages. Compare Act of June 2, 2003, 78th Leg., R.S., H.B. 4, ' 6.02 (House Bill 4) with Act
of June 2, 2003, 78th Leg., R.S., ch. 676, ' 1 (House Bill 2415).





[7] See Act of June 2, 2003,
78th Leg., R.S., H.B. 4, ' 6.04 (House Bill 4); Act of June 2,
2003, 78th Leg., R.S., ch. 676, ' 2(a) (House Bill 2415). 





[8] 
See also City of Dallas v. Redbird Dev. Corp., 143 S.W.3d 375,
388B89 (Tex. App.CDallas 2004, no pet.); Columbia
Med. Ctr. of Las Colinas v. Bush, 122 S.W.3d 835, 865 (Tex. App.CFort Worth 2003, pet. denied).